IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DT APARTMENT GROUP, LP, et al.,        §
                                       §
                        Plaintiffs,    §
                                       §  Civil Action No. 3:12-CV-0437-D
VS.                                    §
                                       §
CWCAPITAL, LLC, et al.,                §
                                       §
                        Defendants.    §

MEMORANDUM OPINION
AND ORDER

        This removed lawsuit is brought by a minority-owned business and a member of a

racial minority group.  It arises from actions taken in connection with the financing of,

attempt to foreclose on, and efforts to sell four apartment complexes that are substantially

occupied by minorities.  In their third amended complaint, plaintiffs assert numerous claims

under federal and state law.  Defendants move to dismiss under Fed. R. Civ. P. 8, 9(b),

12(b)(6), and/or 12(c).  For the reasons that follow, the court grants the motions in part,

denies them in part, and grants plaintiffs leave to replead their claims that have not been

released or that are not time-barred.

I

A

        Plaintiffs DT Apartment Group, LP ("DT Apartment") and Richard Aguilar

("Aguilar")—a minority-owned business and a member of a racial minority group,

respectively—sued defendants CWCapital, L.L.C. ("CWCapital"), CWCapital Mortgage

Securities I, L.L.C. ("CW Mortgage"), and CWCapital Asset Management, L.L.C. ("CW Asset") in Texas state court. After U.S. Bank, N.A. ("US Bank") filed a plea in intervention, plaintiffs added US Bank as a defendant. Defendants removed the suit to this court under the Class Action Fairness Act of 2005. Pub. L. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.).[1]

Plaintiffs' lawsuit arises in connection with their financing of, and attempts to sell, four apartment complexes ("the Properties") that are substantially occupied by racial and ethnic minorities.[2] DT Apartment borrowed the funds to purchase the Properties, and Aguilar guarantied the Note. The Properties also serve as collateral.

The original loan transaction involved several documents, including a deed of trust ("Deed of Trust"), a promissory note ("Note"), and a Cash Management Agreement ("CMA"). The Note contains an article entitled "Minimum Performance Criteria" that prescribes a Debt Service Coverage Ratio ("DSCR")[3] that DT Apartment as the borrower must maintain. When the Minimum Performance Criteria are not met, the CMA imposes a "Cash Restriction Condition" that allows rents to be paid into a "Rent Account" and all

_____

[1]Plaintiffs moved to remand the case, but the court denied the motion.

[2]All defendants move to dismiss under Rule 12(b)(6), and three defendants move to dismiss under Rule 12(c), which is decided under the same standard. For purposes of deciding the motions based on Rules 12(b)(6) and 12(c), the court construes plaintiffs' third amended complaint in the light most favorable to them, accepts as true all well-pleaded factual allegations, and draws all reasonable inferences in their favor. *See, e.g.*, *Lovick v. Ritemoney Ltd.*, 378 F.3d 433, 437 (5th Cir. 2004). The court recounts the background facts accordingly.

[3]The DSCR is a dynamic number that is subject to change over the life of the loan.

- 2 -

security deposits to be paid into a "Security Deposit Account." The parties refer to this as the "lock box" arrangement.

In 2008 CWCapital notified DT Apartment that it was in default of the required DSCR, and it demanded payment of $717,600.67 within three business days. This, along with CWCapital's re-categorization of certain assets that had previously been approved, purportedly triggered the lock box arrangement. Plaintiffs allege that DT Apartment was not in default under the terms of the Note; that CWCapital miscalculated the DSCR and improperly re-categorized assets; and that, as a result, CWCapital improperly triggered the lock box arrangement. Plaintiffs assert that CWCapital used "inaccurate and/or inapplicable information"; "applied . . . the wrong test"; acted "in conflict with the parties' established course of conduct" 3d Am. Compl. ¶¶ 77-78; and that, before signing the CMA, CWCapital made, and plaintiffs relied on, assertions that triggering the lock box arrangement was a distant possibility and statements about how the lock box operated.

Plaintiffs also aver that, once the lock box arrangement was triggered, defendants used it to completely control the revenues of the Properties; that defendants[4]—at least CW Asset—used the lock box arrangement to "withhold, delay, mishandle, mislabel, and misuse

---

[4]Throughout the third amended complaint, plaintiffs allege that acts were committed by "defendants, one or more." They assert that "[g]iven the complexities of the parties' and their documents and prior positions, all facts pertaining to the role or functions of various Defendants are pleaded in the alternative . . . . At all material times Defendants, one or more, conferred or otherwise agreed or cooperated to Plaintiff[s'] disadvantage." 3d Am. Compl. ¶¶ 149-50. Accordingly, the court will generally use the term "defendants" to mean "one or more defendants." When it is important to specify which defendant allegedly acted, the court will do so.

funds," *id.* at ¶ 82; that defendants used the funds for their own purposes; and that DT Apartment was allowed "no right of access to or control over the Rent Account," *id.* at ¶ 83 (internal quotation marks omitted); that disbursements were made in defendants' discretion; and that defendants unreasonably denied or unreasonably delayed providing funds, even to maintain or repair the Properties. Plaintiffs allege that, along with other failures to act reasonably, this conduct damaged them by making it difficult to rent units in the Properties for full value or to keep occupancy rates high, and ultimately "strangled any effective management of the property." *Id.* at ¶ 88; *see also* ¶ 85.

Following these events, the parties entered into a Modification and Extension Agreement ("Modification Agreement") and a Forbearance Agreement ("Forbearance Agreement"). The Modification Agreement [which became effective March 9, 2009] altered the maturity date of the Note from March 9, 2009 to April 8, 2010. The Modification Agreement included a provision under which plaintiffs released, without exception, their existing claims regarding the Properties and associated documents.

Thereafter, the parties entered into the Forbearance Agreement under which the holder of the Note agreed to forbear from exercising its rights and remedies for a temporary, defined period. The Forbearance Agreement included a release clause that was virtually identical to the release in the Modification Agreement, but with one difference: the release clause in the Forbearance Agreement excepted from the release any claims "relating to or in any manner arising out of" circumstances alleged in Exhibit A to the Forbearance Agreement ("Exhibit A").

- 4 -

After the Note became due, CW Mortgage twice notified DT Apartment that it was seeking to foreclose on the property in question. One result of this attempt to foreclosure was to lower the fair market value of the party and to restrict plaintiffs'[5] options in dealing with the property in a difficult market. To avoid foreclosure, plaintiffs requested another modification of the maturity date, which defendants refused.

Without a modified maturity date, plaintiffs sought instead to sell the property. They entered into negotiations with, and later received a letter of intent from, an interested third party. Plaintiffs allege that, after defendants learned of the negotiations, Kevin Thompson ("Thompson"), an employee and representative of CW Asset, requested the identity of the purchaser and then invited the prospective purchaser to bid on the Note at foreclosure. According to plaintiffs, the same thing occurred a second time: DT Apartment was negotiating to sell the Properties, and Thompson requested the identity of the prospective purchaser for the stated purpose of performing due diligence to facilitate the transaction. But when CW Asset was provided the requested information, it did not perform due diligence; instead, it sent notice that it intended to foreclose on the Properties and offered to sell the Note to the potential buyer. Plaintiffs allege that defendants intended to harm them by discouraging potential purchasers.

Plaintiffs assert that, when defendants intended to foreclose, they stated in the notice of sale that any decision about whether CW Asset would subordinate its liens would be

---

[5]The third amended complaint actually refers to "Plaintiff's options," 3d Am. Compl. ¶ 93, but appears in context to mean both plaintiffs, *cf. id.* ¶ 94 (referring to plaintiffs).

announced at the foreclosure sale, something that the Deed of Trust did not permit. They aver that, after noticing the property for foreclosure, defendants sought to exercise complete and unreasonable control via the improperly invoked lock box arrangement; defendants were not responsive to plaintiffs' requests for access to funds to operate the Properties; after a state court denied US Bank's application for appointment of a receiver, defendants improperly declared default and "unilaterally swept several hundred thousand dollars in backup operational funds into [CW Asset] accounts," *id.* at ¶ 130; and defendants applied $350,000 to the unpaid principal of the Note and informed plaintiffs that, to receive funds with which to operate the business, they must agree to appointment of a receiver.

Plaintiffs also aver that defendants have engaged in a pattern of obfuscation in which they have prevented plaintiffs from knowing who held the Note at relevant times.[6] They aver that defendants have contradicted themselves multiple times as to who is the noteholder; that the Modification Agreement lists Wells Fargo Bank, N.A. as the noteholder in trust for the registered holders of CW Mortgage; that defendants represented to a state court that CW Mortgage was the noteholder, but that they had not amended that information when US Bank represented to the state court that it was the noteholder; that two documents were altered without approval of the notary or the affiant; and that US Bank used these documents to establish intervenor status and reverse any prior actual or purported assignment from

---

[6]Much of the third amended complaint discusses alleged points of confusion, inconsistencies, and contradictions regarding the roles of each defendant. Because these are issues that will likely be more thoroughly fleshed out in discovery, the court highlights, but does not delve into, all of the alleged details in recounting plaintiffs' version of the facts.

CWCapital to CW Mortgage.

B

Plaintiffs allege claims for breach of contract, fraud, fraudulent inducement, breach of duty of good faith, negligent misrepresentation, misuse of confidential information, tortious interference with prospective business relations, violations of the Equal Credit Opportunity Act ("ECOA"), the Fair Housing Act ("FHA"), and the Texas Theft Liability Act ("TTLA"), filing false or fraudulent documents, and civil conspiracy. In addition to other requested relief, they seek a declaratory judgment under federal and Texas law. Defendants CW Mortgage, CW Asset, and US Bank move to dismiss each claim under Rules 9(b), 12(b)(6), and 12(c).[7] Defendant CWCapital moves to dismiss each claim under Rules 12(b)(6), 8, and 9(b). Plaintiffs oppose the motions. The court will address both motions together given the substantial overlap between the two.[8]

---

[7]Their request for oral argument is denied. *See* N.D. Tex. Civ. R. 7.1(g).

[8]There are instances in which CW Mortgage, CW Asset, and US Bank have moved to dismiss on a basis on which CWCapital has not, and vice versa. Where a ground for dismissal has not been asserted in both motions, but the ground is equally applicable to each defendant, the court is raising *sua sponte* that the nonmoving party is also entitled to dismissal on the same basis. Because the court is allowing plaintiffs to replead as to claims to which this procedure applies, the procedure is fair and is therefore permissible. *See, e.g., Biggers v. BAC Home Loans Servicing, LP*, 767 F.Supp.2d 725, 733-34 n.7 (N.D. Tex. 2011) (Fitzwater, C.J.) (noting that district court has authority to consider sufficiency of complaint and dismiss action on its own motion as long as procedure employed is fair, raising ground for dismissal *sua sponte*, and concluding that procedure was fair because court was granting plaintiffs leave to replead). Because there are multiple instances where one motion raises a ground for dismissal and the other does not, the court will not identify each time it raises a basis for dismissal *sua sponte*.

II

A

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of plaintiffs' amended complaint by 'accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Bramlett v. Med. Protective Co. of Fort Wayne, Inc.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and alteration omitted)).  To survive defendants' motion to dismiss under Rule 12(b)(6), plaintiffs must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]").  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)) (alteration omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citation omitted).

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to

delay trial—a party may move for judgment on the pleadings." "'A motion brought pursuant to [Rule] 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts.'" *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam)).   The standard for deciding a motion under Rule 12(c) is the same as the one for deciding a motion to dismiss under Rule 12(b)(6).   *See Hoffman v. L & M Arts*, 2011 WL 3567419, at *4 (N.D. Tex. Aug. 15, 2011) (Fitzwater, C.J.) (citing *Gentilello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010)).

## B

"Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud." *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *appeal docketed*, No. 12-10277 (5th Cir. Mar. 13, 2012).   "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id*. (quoting *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)). More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud. *Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (citations omitted).   Because Rule 9(b) must be "read in conjunction with Rule 8 which requires only

a short and plain statement of the claim showing that the pleader is entitled to relief," *id.* (quoting *Landry v. Air Lines Pilots Ass'n International AFL–CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990) (internal quotation marks and alteration omitted)), "punctilious pleading detail" is not required, *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.).  "The court's key concern in assessing a complaint under Rule 9(b) is to determine whether the plaintiff seeks to redress specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *4 (N.D. Tex. Aug. 28, 2007) (Fitzwater, J.) (internal quotation marks and citations omitted).

### III

The court turns first to plaintiffs' breach of contract claim.

### A

"A breach of contract claim under Texas law requires proof of four elements: (1) the existence of a valid contract, (2) plaintiff's performance of duties under the contract, (3) defendant's breach of the contract, and (4) damages to the plaintiff resulting from the breach." *Mesa v. Verizon Bus. Network Servs., Inc.*, 2012 WL 3452696, at *12 (N.D. Tex. Aug. 14, 2012) (Fitzwater, C.J.) (citing *Lewis v. Bank of Am. NA*, 343 F.3d 540, 544-45 (5th Cir. 2003)).  Plaintiffs assert three different claims for breach of contract, each of which defendants move to dismiss: (1) the imposition of the lock box; (2) the administration of the lock box; and (3) CW Mortgage and CW Asset's noticing foreclosure in a manner that conflicted with the Deed of Trust or applicable foreclosure law.  Plaintiffs allege that, "[a]t

- 10 -

the very least, Defendants have acted unreasonably or unreasonably delayed acting and have, at times willfully disregarded the contractual terms."  3d Am. Compl. ¶ 160.

B

1

To the extent plaintiffs rely on the "Remedies of Borrower" provision of the Deed of Trust to allege that defendants unreasonably imposed the cash conditions restriction and administered the lock box, they have failed to state a claim on which relief can be granted. That provision reads:

> In the event that a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case where by law or under the Note, this Security Instrument or any of the other Loan Documents, it has an obligation to act reasonably or promptly, neither Lender nor Trustee shall be liable for any monetary damages, and Borrower's remedies shall be limited to injunctive relief or declaratory judgment.

CWCapital 6-7-12 App. 98.  CWCapital argues that this provision "merely states that if, and only if, CWCapital is found by a court to have acted unreasonably under any of the other terms of the Loan Documents, Borrower's remedies are limited to injunctive relief or declaratory judgment[,] [but it] imposes no independent obligation of 'reasonableness' on CWCapital."  CWCapital 6-7-12 Br. 9.  Plaintiffs respond that it must be read as creating a duty of reasonableness, or it is rendered meaningless.

The court recognizes that, under Texas law, it must not interpret a contract in a way that renders a provision meaningless. *See, e.g., Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.

1983).  But this provision makes clear that the restriction on the remedy applies only "in any case where by law or under the Note, this Security Instrument or any of the other Loan Documents, it has an obligation to act reasonably or promptly."  Plaintiffs must therefore plead sufficient facts to allow the court to draw the reasonable inference that, by law, or under the Note, the Deed of Trust, or any of the other loan document, defendants had an obligation to act reasonably or promptly.[9]  Because they have not, the court dismisses this basis for the breach of contract claim.

2

Plaintiffs have stated a plausible breach of contract claim, however, regarding the imposition—but not the administration—of the lock box insofar as it is predicated on defendants' alleged violation of § 501 of the Note.  Plaintiffs allege that CWCapital claimed a deficiency in the DSCR based on § 501 at a time when there was no deficiency.  Defendants allegedly applied the "wrong test" and used "inaccurate and/or inapplicable information" to calculate the DSCR, and therefore "there was no obligation of [DT Apartment] to meet any DSCR test under the express terms of the Note."  3d Am. Compl. ¶ 80.[10]  This contrasts with the claims predicated on defendants' *administration* of the lock

_____

[9]Texas has explicitly rejected an implied covenant of good faith and fair dealing, which would include a duty of reasonableness.  *See Tex. Nat'l Bank v. Sandia Mortg. Corp.*, 872 F.2d 692, 698-99 (5th Cir. 1989) (citing *English v. Fischer*, 660 S.W.2d 521, 522 (Tex. 1983)).

[10]Defendants argue that plaintiffs have failed to state a claim based on improper invocation of the lock box arrangement because, in the Modification Agreement, plaintiffs acknowledged "that a Cash Restriction Condition . . . ha[d] occurred."  CWCapital 6-7-12

- 12 -

box, which, even when viewed in the light most favorable to plaintiffs, appear to be based on reasonableness.

3

Plaintiffs allege that defendants violated the Deed of Trust when Wyatt Maxwell, who was listed as the substitute trustee, "announce[d] at a foreclosure sale whether or not [CW Asset] 'chooses to subordinate its liens securing the Indebtedness to any Other Matters.'" 3d Am. Compl. ¶ 118 (ellipsis omitted) (quoting notice of sale). This allegation, along with any other alleged procedural violations, does not state a claim on which relief can be granted because plaintiffs have not alleged any resulting damages. Plaintiffs assert that defendants' action would chill the price at the foreclosure sale, but they do not allege that there was ever a foreclosure sale. Therefore, unlike procedural violations that actually cause a lower price at foreclosure, *see Charter National Bank-Houston v. Stevens*, 781 S.W.2d 368, 371-72 (Tex. App. 1989, pet. denied) (action for wrongful foreclosure), there are no damages alleged to support a breach of contract claim.[11] Since "damages to plaintiffs resulting from the breach"

---

App. 160. Even if this acknowledgment is evidence that the provision was not improperly invoked, it is insufficient at the Rule 12(b)(6) stage to render plaintiffs' breach of contract claim facially implausible.

[11]Plaintiffs also allege that CW Mortgage had no right to foreclose because "[t]here has been no showing, for example, that [it] was even in existence [at the time]." 3d Am. Compl. ¶ 92. Plaintiffs do not, however, allege sufficient facts to make this claim facially plausible. The only supporting fact is that the company "is not listed currently with the Massachusetts Secretary of State's Office as being currently in existence." *Id.* This does not make the claim facially plausible because it addresses whether the company is listed now, not when the foreclosure was noticed, and it contradicts an assumption of plaintiffs' lawsuit: that CW Mortgage does exist.

is an essential element of a breach of contract claim, the deficiency is fatal.

### 4

The court therefore dismisses all claims for breach of contract that are premised on the alleged unreasonableness of defendants' actions regarding the imposition of the lock box or its administration, and the alleged violation of foreclosure requirements in the Deed of Trust. The court does not dismiss claims for breach of contract that are premised on defendants' applying the wrong test or inapplicable information to impose the lock box, in contravention of the Minimum Performance Criteria. *But see infra* § XVI(C) (addressing affirmative defense of release).

### IV

The court now considers plaintiffs' fraud claim.

### A

The elements of common law fraud in Texas are

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004) (Texas law) (internal citations omitted). To prove fraud based on a promise of future performance, a plaintiff must show that the person making the promise had no intention of performing at the time he made the promise. *Id.*

B

Plaintiffs appear to allege four fraud claims: (1) defendants misrepresented how they would exercise their discretion regarding the lock box arrangement; (2) CW Mortgage and CW Asset scheduled foreclosure without a legal right to do so; (3) defendants misled plaintiffs in order to obtain confidential information, which they then used to chill potential purchasers at a foreclosure sale; and (4) defendants "induced" plaintiffs "unknowingly" into "a fee-driven, not market driven [Commercial Mortgage Backed Securities] structural fraud [by] . . . inducing borrowers" to secure loans, then assigning the interests to other parties and allowing them to "harass, threaten, and act against borrowers such as Plaintiff."  3d Am. Compl. ¶ 169.

CWCapital posits that these allegations do not state a claim because they have not been pleaded with the specificity required by Rule 9(b).  CW Mortgage, CW Asset, and US Bank maintain that plaintiffs could not have justifiably relied on defendants' representations about how they would exercise discretion regarding the lock box arrangement, and that there can be no fraud associated with the scheduled foreclosure because defendants had a right to foreclose.[12]

---

[12]Although CW Mortgage, CW Asset, and US Bank include this in their brief in a section entitled, "Count 3 Fails to State a Claim for Fraudulent Inducement," the arguments refer to fraud as well as fraudulent inducement.  *See* CW Mortgage et al. 6-4-12 Br. 12-13.

C

1

Plaintiffs' allegation that defendants "misrepresented the basis for understanding how it would exercise discretion in relation to operations, including any possible lock box use," 3d Am. Compl. ¶ 164, fails to state a claim on which relief can be granted.  "[T]he Texas Supreme Court has declared that '[i]f the defendant's *conduct . . .* would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claim may *also* sound in tort.'"  *Northwinds Abatement, Inc. v. Emps. Ins. of Wausau*, 258 F.3d 345, 352 (5th Cir. 2001) (ellipsis and second alteration in original) (quoting *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)).   Plaintiffs allege that defendants miscalculated the DSCR under the contract.  They have not pleaded facts that would allow the court to draw the reasonable inference that defendants' conduct gives rise to liability independent of the fact that a contract existed between the parties.  And a mere breach of contract, of course, is not of itself an act of fraud.  *See, e.g., Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006) ("[T]he usual view is that mere breach of contract is not fraud and that it may not be evidence of fraud." (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 252 (Tex.1962))).  The claim also fails to satisfy Rule 9(b) because it does not allege that CWCapital acted with *scienter* regarding the inaccurate DSCR calculation.  The third amended complaint alleges only that the calculation was in fact inaccurate.  The court therefore dismisses this component of plaintiffs' fraud claim.

2

Plaintiffs allege that CW Mortgage and CW Asset scheduled foreclosure without a legal right.  They assert that, because they "believed Defendants['] repeated representations that [CW Mortgage] was the Lender/Noteholder and had the right to foreclose," they sought an extension of the maturity of the loan.  3d Am. Comp1. ¶ 94.  This fails to state a claim for multiple reasons.

First, plaintiffs do not allege that defendants acted with an intent that plaintiffs would respond to the foreclosure notice in any way.  They merely allege that plaintiffs in fact responded by seeking an extension.  The allegations also fail to satisfy Rule 9(b) because they do not specify the "time, place and nature" of the false statements and each "defendant's relationship thereto."  *Bhatia v. Dischino*, 2011 WL 3820825, at *12 (N.D. Tex. Aug. 29, 2011) (Boyle, J.).[13]  The third amended complaint does not specify the statements that were misleading and who made them; instead, it vaguely alleges that plaintiffs "believed Defendants['] repeated representations."  3d Am. Compl. ¶ 94.

Plaintiffs also fail to plausibly plead that, simply because defendants now maintain that US Bank is the noteholder, CW Mortgage and CW Asset were not authorized to schedule foreclosure at the time.  The third amended complaint merely relies on US Bank's

_____

[13]Plaintiffs respond to defendants' Rule 9(b) arguments by contending that their "pleading more than sufficiently set out a claim for fraud under Texas law," and citing Texas cases.  Ps. 6-25-12 Br. 19.  Although Texas *substantive* law governs plaintiffs' fraud claims, the standard of Rule 9(b) governs how the fraud claims must be *pleaded*.  *See, e.g., Berry v. Indianapolis Life Ins. Co*, 608 F.Supp.2d 785, 795-96 (N.D. Tex. 2009) (Boyle, J.) (citing *Colonial Penn Ins. Co. v. Mkt. Planners Ins. Agency, Inc.*, 1 F.3d 374, 376 (5th Cir. 1993)).

current noteholder status and purported lack of produced assignment documents to assert that CW Mortgage and CW Asset were not authorized to act. But to state a facially plausible fraud claim, plaintiffs must at least allege facts that address why these defendants were not authorized to foreclose on the Properties. As now pleaded, this allegation seeks "a license to go fishing for indica of fraud." *Garcia*, 2007 WL 2428572, at *4 (citations omitted).

3

Plaintiffs have sufficiently pleaded a facially plausible claim that CW Asset misled them into disclosing confidential information. They assert that, when DT Apartment entered into negotiations to sell the Properties, Thompson, an employee and representative of CW Asset, requested the prospective buyer's identity, and plaintiffs disclosed this information together with specific terms of the proposed deal. CW Asset then allegedly informed the prospective buyer that it would soon post the property for foreclosure, and it invited the prospective buyer to bid on the Note. Later, plaintiffs negotiated with another potential buyer, and Thompson again contacted plaintiffs, telling Aguilar that he needed the prospective purchaser's identity to perform due dillegnce.[14] According to plaintiffs, instead of performing due diligence, CW Asset offered to sell the Note to the potential buyer, and CB Richard Ellis, as agent for CW Asset, "sent the potential buyer an invitation to bid on the notes." 3d Am. Compl. ¶ 104. As a result, plaintiffs were damaged by not being able to sell at fair market value. Given these factual allegations, plaintiffs have alleged with requisite

---

[14]The third amended complaint actually alleges that Thompson represented CW Mortgage. *See* 3d Am. Compl. ¶ 100. This appears to be a typographical error.

specificity that CW Asset misrepresented its intentions in obtaining information in order to

harm plaintiffs.

Plaintiffs have not complied with Rule 9(b), however, as to the other three defendants.

> Multiple defendants' conduct may be lumped together if the
> plaintiff's allegations elsewhere designate the nature of the
> defendants' relationship to a particular scheme and identify the
> defendants' role[, but] Rule 9(b) still requires a plaintiff to assert
> the time, place, and nature of the alleged fraudulent behavior
> and a defendant's relationship thereto.

*Bhatia,* 2011 WL 3820825, at *12 (citation and quotation marks omitted).   The third

amended complaint alleges that "[a]t all material times Defendants, one or more, conferred

or otherwise agreed or cooperated to Plaintiff's disadvantage.  Defendants are therefore

legally liable to Plaintiff(s) for their acts and/or for the acts of each other in the context of

what has been alleged above[.]"  3d Am. Compl. ¶ 150.  This is the only allegation in which

plaintiffs attempt to connect CW Asset's actions to the responsibility of the other defendants.

Such a broad and factually unsupported statement is insufficient under Rule 9(b).  The court

therefore dismisses this ground of the fraud claim as to all defendants except CW Asset.

4

Plaintiffs have failed to plead with particularity that defendants "induced" plaintiffs

"unknowingly" into "a fee-driven, not market driven [Commercial Mortgage Backed

Securities] structural fraud [by] . . . inducing borrowers" to secure loans, then assigning the

interests to other parties and allowing them to "harass, threaten, and act against borrowers

such as Plaintiff."  3d Am. Compl. ¶ 169.  Plaintiffs have not pleaded specifically that any

particular defendant misrepresented any material fact.  *See Bhatia,* 2011 WL 3820825, at *12.  And they not only have failed to plead the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation," *Turner*, 2011 WL 3606688, at *2, they have not pleaded anything regarding misrepresentation or reliance.  Rather, plaintiffs rely on the conclusory assertion that defendants "misrepresented the nature and extent of its fraudulent structure,"  3d Am. Compl. ¶ 169, where that "fraudulent structure" appears to arise, not from specific misrepresentations, but from defendants' use of fees, resemblance to Residential Mortgage Backed Securities, and surreptitious transfers of the Note from one party to another.  Indeed, the fact section is written in terms of conjecture.  *See, e.g. id.* at ¶ 144 ("The awkwardness of the missing documents would also explain . . . .";  *id.* at ¶ 143 ("That similar dynamic would explain . . . .").  This component of the fraud claim is therefore dismissed.

## V

Plaintiffs also allege a claim for fraudulent inducement.

## A

To state a claim under Texas law for fraudulent inducement, a plaintiff must allege all of the elements of fraud as well as "an underlying contract which was induced."  *Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2011)).  Plaintiffs allege that defendants "made material representations to Plaintiffs about the operation of the [CMA] and the lock box accounts both before and after the signing of the [loan documents]."  3d Am. Compl. ¶ 172.

Before the contract was signed, CWCapital allegedly represented that there was a particular custom for operating under the contract. CW Asset allegedly made similar representations after the contract was signed.[15] CW Mortgage, CW Asset, and US Bank maintain that the claim must be dismissed because, as a matter of law, plaintiffs could not have justifiably relied on defendants' alleged statements regarding how they would operate under the contract.

B

The court holds that plaintiffs have not plausibly pleaded justifiable reliance. Common law fraud, and therefore fraudulent inducement, requires reliance, and this reliance "must be both actual and justifiable." *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 386 (Tex. App. 2012, pet. filed) (citing *Grant Thornton L.L.P. v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010)). Plaintiffs allege they were justified in relying on statements about the likelihood of triggering the lock box arrangement, as well the practice and custom of operating under the loan documents. Yet "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law." *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App. 2003, pet. denied) (on rehearing en banc) (addressing fraudulent inducement claim) (citing cases). "[A] party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own

_____

[15]Plaintiffs do not allege that CW Mortgage or US Bank made any misrepresentations resulting in fraudulent inducement.

interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *Id.* (citing *Thigpen*, 363 S.W.2d at 251). The lock box arrangement is not ambiguous, and, therefore, as a matter of law it was not reasonable for plaintiffs to rely on the alleged representations on which they seek to recover for fraudulent inducement. Similarly, the loan documents specified defendants' rights under the lock box arrangement, and plaintiffs cannot plausibly allege that they were under the impression that the rights would be exercised differently. Plaintiffs' fraudulent inducement claim is therefore dismissed.[16]

## VI

The court next considers whether plaintiffs have stated a claim for negligent misrepresentation.

## A

> Under Texas law, the elements of a claim for negligent misrepresentation are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*5636 Alpha Rd. Joint Venture v. NCNB Tex. Nat'l Bank*, 879 F. Supp. 655, 664 (N.D. Tex. 1995) (Fitzwater, J.) (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.

---

[16]Plaintiffs' allegations also do not comply with the Rule 9(b) pleading standard for fraud.

1991)).  According to the third amended complaint, one or more defendants "made materially false and misleading statements to Plaintiff[s] regarding [plaintiffs']¹⁷ rights and obligations under the loan agreements, and inducing Plaintiff[s] to believe that [CW Mortgage] would enter into a further forbearance agreement."  3d Am. Comp. ¶ 185.  Plaintiffs allege that, relying on these statements, they did not sell the Properties or find a substitute loan.  The parties never entered into a further forbearance agreement.

B

Because plaintiffs do not base their negligent misrepresentation argument on the same set of facts as their fraud claims, the court analyzes whether they have alleged a plausible claim under Rule 8 rather than Rule 9(b).  *See Massey v. JPMorgan Chase Bank, N.A.*, 2012 WL 3743493, at *3 (N.D. Tex. Aug. 29, 2012) (McBryde, J.) (addressing, *inter alia*, negligent misrepresentation claim under the standard set forth in Rule 8(a)(2), and common law fraud, statutory fraud, and fraud by misrepresentation claims under the heightened standard for fraud allegations required by Rule 9(b)); *cf. Kougl v. Xspedius Mgmt. Co.*, 2005 WL 1421446, at *5-6 (N.D. Tex. June 1, 2005) (Fitzwater, J.) (holding that when plaintiffs "fail to distinguish their negligent misrepresentation claims from those based on fraud, the court will not separate the two when applying its Rule 9(b) analysis) (citation omitted).

The court holds that plaintiffs have failed to state a plausible claim of negligent misrepresentation.  Plaintiffs allege that defendants made materially false statements, but

_____

¹⁷The third amended complaint actually uses the indefinite pronoun "its."  The court has drawn the inference in favor of plaintiffs that "its" means plaintiffs.

- 23 -

they do not plead the content or even the general nature of these statements, nor have they specified how the statements were false or misleading. Plaintiffs assert that the misrepresentations were meant to guide others and that defendants did not use reasonable care, but they fail to plead factual support for either allegation. Finally, they allege that the "misrepresentations proximately caused" their injury, but do not allege how they were injured, i.e., allege that they suffered pecuniary loss. *See* 3d Am. Compl. ¶ 191 ("Such misrepresentations proximately caused injury to Plaintiffs, which resulted in damages."). Plaintiffs' allegations are "little more than legal conclusions, and lack[] sufficient factual allegations to state a claim." *Massey*, 2012 WL 3743493, at *9 (dismissing negligent misrepresentation claim for failing to plead plausible claim); *see also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted).

VII

The court now turns to plaintiffs' claim for breach of fiduciary duty.

A

To prevail on a claim for breach of fiduciary duty, there must be a fiduciary relationship between the parties. *See, e.g., Las Colinas Obstetrics-Gynecology-Infertility Ass'n, P.A. v. Villalba*, 324 S.W.3d 634, 645 (Tex. App. 2010, no pet.) ("To prove its claim for breach of fiduciary duty, the [plaintiff] was required to prove the existence of a fiduciary duty, breach of the duty, causation, and damages."). "Lenders ordinarily have no fiduciary duty to borrowers or putative borrowers." *Esty v. Beal Bank, S.S.B.*, 298 S.W.3d 280, 304

(Tex. App. 2009, no pet.) (citing *In re Absolute Res. Corp.*, 76 F.Supp.2d 723, 724 (N.D. Tex. 1999) (Maloney, J.)).

Plaintiffs allege the following different bases for finding a fiduciary relationship: "a long-standing, special relationship of trust and confidence between [the parties]," 3d Am. Compl. ¶ 179; the Deed of Trust; and defendants' "controlling position over [plaintiffs]." *Id.* at ¶ 180. Defendants maintain that no fiduciary duties arise from the contract, and that while they have exercised some control over plaintiffs' business, such control has not been sufficiently excessive.

B

1

The third amended complaint contains only a conclusory allegation that defendants owe fiduciary duties based on their relationship. *See* 3d Am. Compl. ¶ 179 ("By the acts and conduct set forth above and because of the relationship between Plaintiffs and Defendants, one or more, and the extraordinary domination and control which said Defendants have exercised and continue to exercise over Plaintiffs and the property(ies) in question, including funds paid to said Defendants but due to Plaintiffs, said Defendants owe Plaintiffs a fiduciary duty, which includes the duty of utmost honesty, good faith, fair dealing, and full disclosure."). And even if plaintiffs had adequately pleaded that they had a longstanding relationship with defendants that generated their subjective trust in defendants, "[t]he fact that a business relationship has been cordial and of extended duration is not by itself evidence of a confidential relationship." *K3C Inc. v. Bank of Am., N.A.*, 204 Fed. Appx. 455,

461 (5th Cir. 2006) (per curiam) (quoting *Swinehart v. Stubbeman, McRae, Sealy, Laughlin & Browder, Inc.*, 48 S.W.3d 865, 880 (Tex. App. 2001, pet. denied)).  Similarly, "subjective trust is not enough to transform an arms-length transaction between debtor and creditor into a fiduciary relationship." *Id.* (quoting *Bank One, Tex., N.A. v. Stewart*, 967 S.W.2d 419, 442 (Tex. App. 1998, pet. denied)).

2

Plaintiffs' argument that the Deed of Trust establishes a fiduciary relationship fails for the same reason as does their breach of contract claim: it is premised on ¶ 42 of the Deed of Trust, which does not impose a duty of reasonableness but limits plaintiffs' remedies if a court should find a breach of some external obligation of reasonableness.  Absent a citation to some other contractual provision that establishes a duty of good faith, plaintiffs have not stated a plausible claim that there exists a fiduciary relationship based on the parties' agreements.[18]

3

Although a fiduciary relationship can exist in "extraordinary circumstances such as excessive control and influence by the lender on the borrower's business," *Esty*, 298 S.W.3d at 304 (quoting *Absolute Res. Corp.*, 76 F.Supp.2d at 723, 734), plaintiffs have not pleaded facts that would allow the court to draw the reasonable inference that such extraordinary circumstances exist.

---

[18]Furthermore, CMA § 8.07 disclaims any joint ventureship, partnership, or agency relationship arising from that agreement.

Plaintiffs argue that defendants withheld confirmation of a receipt resulting in an operation standstill and "refused to release [DT Apartment's] own funds to increase the rentals at the complexes unless DT [Apartment] agreed to a Receiver." Ps. 6-25-12 Br. 17 (citing 3d Am. Compl. ¶¶ 125, 131-33). They assert that plaintiffs could not expend "significant funds . . . to operate and maintain the apartments without Defendants' approval." Ps. 6-25-12 Br. 18. Plaintiffs cite *State National Bank of El Paso v. Farah Manufacturing*, 678 S.W.2d 661, 681 (Tex. App. 1984, writ dism'd by agr.), *called into question on other grounds by Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 724 (Tex. 2001), for the proposition that a lender owes a fiduciary duty to a borrower when the lender exercises excessive control. But that case is distinguishable. In *Farah*, in the context of a claim for interference, the lender continually interfered with the borrower's management, including forcing a board member's resignation, preventing the election of others, and installing a CEO who was friendly to the lender. *Id.* at 668, 688. The court held that the borrower "was entitled to have its affairs managed by competent directors and officers who would maintain a high degree of undivided loyalty to the company." *Id.* at 690. Plaintiffs have failed to plead sufficient facts to enable the court to draw the reasonable inference that defendants exercised excessive control and influence over plaintiffs' business. And the lock box arrangement does not "*ipso facto* prove [] control," "[e]ven if the lenders approved each and every one of [the borrower's] business expenditures." *Valdes v. Leisure Res. Grp., Inc.*, 810 F.2d 1345, 1355 (5th Cir. 1987) (analyzing whether there was sufficient control to consider lender and borrower to be alter egos). "[T]he ability of a lender to monitor a debtor's expenditures

pursuant to a loan agreement represents a veto power which is negative in nature" and generally "does not amount to domination or control."  *Id.* (citing *Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.*, 483 F.2d 1098, 1111 (5th Cir. 1973), *reh'g denied*, 490 F.2d 916 (5th Cir. 1974) (per curiam)).  Although *Valdes* analyzed the issue of control in a different context, defendants were exercising limited power designed to ensure full repayment of the loan.  As pleaded in the third amended complaint, plaintiffs have failed to state a plausible claim that a fiduciary relationship arose.

Plaintiffs' claim for breach of fiduciary duty is therefore dismissed.

VIII

The court now considers plaintiffs' claim for misuse of confidential information.

A

Plaintiffs allege that they entrusted defendant's agent (Thompson) with confidential, proprietary information: the identity of the investor who had presented plaintiffs with a letter of intent to purchase the Properties.  They aver that Thompson represented that he needed the identity and contact information so that he could facilitate the transaction and approve the assumption of the loan, but he instead contacted the buyer and suggested that the buyer purchase the loan from the noteholder, which effectively killed the offer to purchase the Properties.

Defendants contend, *inter alia*, that Texas does not recognize a cause of action for disclosing confidential information that is not a trade secret, and that Texas courts have not recognized liability for misuse of confidential information in addition to liability for misuse

of trade secrets.

## B

The court concludes that Texas does not recognize a claim for misuse of confidential information that is not either secret or, at least substantially secret. And it concludes that the third amended complaint does not state a plausible claim for misuse of confidential information or trade secret misappropriation.

In *Stewart & Stevenson Services, Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89 (Tex. App. 1994, writ denied), the court rejected the contention that Texas recognizes liability for misuse of confidential information in addition to liability for misuse of trade secrets. *Id.* at 97. Instead, after conducting a detailed analysis of the case law, it "conclude[d] that there is no cause of action for misappropriation of confidential information that is not either secret or, at least *substantially* secret." *Id.* at 99. In the third amended complaint, the only allegation that relates to the trade secret status of the information is the assertion that the information given to Thompson regarding the identity of the purchaser "ordinarily would have been treated as confidential, proprietary information with trade secret status." 3d Am. Compl. ¶ 193. This allegation is inadequate to state a plausible claim for misuse of confidential information or for trade secret misappropriation.

"A trade secret is any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *CQ, Inc. v. TXU Min. Co.*, 565 F.3d 268, 274 (5th Cir. 2009) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)). "It

- 29 -

differs from other secret information in a business in that it is not simply information as to single or ephemeral events in the conduct of the business . . . .  A trade secret is a process or device for continuous use in the operation of the business."  *Id.* (quoting Restatement of Torts § 757, cmt. b.).  Plaintiffs' conclusory allegation that the information about the identity of a prospective purchaser is a trade secret is insufficient to enable the court to draw the reasonable inference that the information is a trade secret.

Plaintiffs' claim for misuse of confidential information is dismissed.

IX

Plaintiffs also allege a claim of tortious interference with prospective business relations.

A

To establish a claim for tortious interference with prospective business relations, a plaintiff must prove

> (1) a reasonable probability that the parties would have entered into a contractual relationship; (2) an independently tortious or unlawful act by the defendant that prevented the relationship from occurring; (3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and (4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*Faucette v. Chantos*, 322 S.W.3d 901, 914 (Tex. App. 2010, no pet.) (citation and internal quotation marks omitted).  Plaintiffs base their claim on two grounds: first, that defendants "engaged in a deceptive and fraudulent scheme or artifice for the purpose of obtaining the

- 30 -

name of the purchaser so [that they] could tell the prospective purchaser of the impending foreclosure," which caused a failed sale of the Properties and actual damages to plaintiffs, 3d Am. Compl. ¶¶ 198, 199, and 201; and, second, that defendants' demand for $717,600.67 within three business days of notifying plaintiffs that DT Apartment violated the Minimum Performance Criteria deprived plaintiffs of invested funds and control of operations, *id.* at ¶¶ 200-01.   CW Mortgage, CW Asset, and US Bank maintain that the first ground fails because the allegations of the third amended complaint do not support a misappropriation of confidential information claim, and therefore there is no independent tort.   CWCapital argues that the second ground fails because defendants were legally entitled to trigger the lock box arrangement.

B

Plaintiffs' first ground is sufficient to state a plausible claim.   The alleged letter of intent to purchase plausibly shows that there was a reasonable probability that plaintiffs would have entered into a contractual relationship with the prospective purchaser.   It is also plausible that defendants' telling the prospective purchaser about the impending foreclosure halted the deal and damaged plaintiffs.   Although CW Mortgage, CW Asset, and US Bank correctly argue that plaintiffs' trade secret misappropriation claim cannot serve as the required independently tortious act, plaintiffs separately allege that defendants "engaged in a deceptive and fraudulent scheme or artifice for the purpose of obtaining the name of the purchaser so [they] could tell the prospective purchaser of the impending foreclosure[.]"   3d Am. Compl. ¶ 199.

C

Plaintiffs' second ground, however, does not state a claim on which relief can be granted. Texas courts have consistently held that a party cannot bring a tort claim if the party's "relationship and attendant duties arise from a contract." *DeFranceschi v. Wells Fargo Bank, N.A.*, 837 F.Supp.2d 616, 625 (N.D. Tex. 2011) (Means, J.) (citing *Sw. Bell Tel. Co.*, 809 S.W.2d at 493-95). The second ground of plaintiffs' tortious interference claim is based solely on defendants' alleged demand for funds pursuant to a contractual provision. Moreover, plaintiffs' alleged damages of invested funds and control of their operations are damages to the subject matter of the contract—namely, investing in and operating the Properties. *Sw. Bell Tel. Co.*, 809 S.W.2d at 494 ("When the only loss or damage is to the subject matter of the contract, the plaintiff's action is ordinarily on the contract."). For these reasons, plaintiffs' remedy for defendants' allegedly improper invocation of the lock box is a breach of contract claim.

Accordingly, the court dismisses in part plaintiffs' claim of tortious interference with prospective business relations.

X

The court now turns to plaintiffs' statutory claims. The court will consider together their actions under the ECOA and the FHA.

- 32 -

A

The ECOA states, in relevant part, that "[i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . on the basis of race[.]"  15 U.S.C. § 1691(a).  The FHA provides that "[i]t shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race[.]"  42 U.S.C. § 3605(a).

B

Plaintiffs allege that defendants discriminated against Aguilar, a member of a racial minority group, and against DT Apartment, a minority-owned business, by triggering the lock box arrangement, threatening foreclosure, interfering with a potential sale, and failing to extend credit when plaintiffs were current on all payments.  Plaintiffs also assert that, even if defendants had a right to trigger the lock box arrangement, they "did so in a manner that did not allow [plaintiffs] . . . to adequately serve a largely minority tenant base."  3d Am. Compl. ¶ 203.  According to the third amended complaint, defendants did not treat plaintiffs "in the same manner as they would have treated a non-minority commercial borrower," and their "policy and practice of utilizing the Lock Box arrangement to interfere with the operations, and diminish the value of the properties, had the effect of harming" plaintiffs and their "primarily minority constituency."  *Id.*  Defendants maintain that these allegations do not state a plausible claim for relief because plaintiffs fail to allege facts supporting their conclusion of discriminatory impact or discriminatory intent.  CW Mortgage, CW Asset, and

US Bank also contend that, "to the extent that Plaintiffs are attempting to assert a discriminatory impact on the 'minority constituency' tenants of the Property, they lack standing to do so." CW Mortgage et al. 6-4-12 Br. 19-20. Plaintiffs respond that they "are not attempting to obtain standing merely on behalf of harm caused their tenants." Ps. 6-25-12 Br. 24. Yet they assert that harm to their tenants is sufficient to confer standing under the FHA. In light of this response and the lack of allegations that minority tenants' ECOA rights were violated, the court understands the only standing issue to be whether plaintiffs have standing under the FHA to bring suit for discrimination against minority constituents.[19]

## C

Because standing is a prerequisite to the exercise of federal jurisdiction, the court first addresses whether plaintiffs have standing to assert claims on behalf of minority tenants. *See AHF Cmty. Dev., L.L.C. v. City of Dall.*, 633 F.Supp.2d 287, 292 (N.D. Tex. 2009) (Fitzwater, C.J.) (citing *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 721 (5th Cir. 2007)).[20]

### 1

The doctrine of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "To satisfy the case-or-controversy requirement of Article III of the Constitution,

---

[19]It is not necessary for the court to address standing under the ECOA at this time.

[20]Although defendants include this argument in their Rule 12(b)(6) motion, the court treats the argument as made under Rule 12(b)(1) because it challenges the court's subject matter jurisdiction.

the plaintiff must show that it has 'suffered injury in fact, that the injury is fairly traceable to the actions of the defendant, and that the injury will likely be redressed by a favorable decision." *AHF Cmty. Dev.*, 633 F.Supp.2d at 292 (quoting *Bennett v. Spear*, 520 U.S. 154, 162 (1997)). The prudential standing requirements are "judicially self-imposed," *Allen v. Wright*, 468 U.S. 737, 751 (1984), and include

> whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 363 (5th Cir. 1999).

"Congress may, however, 'by legislation, expand standing to the full extent permitted by Art. III,' thus proscribing the judicial cognizance of prudential standing considerations." *AHF Cmty. Dev.*, 633 F.Supp.2d at 293 (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 100 (1979)). For some time, courts understood that Congress had abrogated prudential standing for FHA claims. *See id.* But the Supreme Court recently stated that, although it has said before that FHA plaintiffs need only meet Article III standing requirements, "those cases [were] compatible with the 'zone of interests' limitation." *Thompson v. N. Am. Stainless, L.P.*, ___ U.S. __, 131 S.Ct. 863, 869 (2011). Indeed, the case on which later Supreme Court decisions rely for the proposition of abrogated prudential standing says only that prudential standing is abrogated "insofar as tenants of the same housing unit that is charged with discrimination are concerned." *Id.* (quoting *Trafficante v.*

*Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (emphasis omitted)).  Although *Thompson*

involved a claim under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §

2000e *et seq.*, rather than an FHA claim, the Court interpreted the phrase "person aggrieved"

as "establish[ing] a regime under which a plaintiff may not sue unless he 'falls within the

'zone of interests' sought to be protected by the statutory provision whose violation forms

the legal basis for his complaint.'"  *Id.* at 870 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497

U.S. 871, 883 (1990)).[21]  Because the FHA allows suit by an "aggrieved person," 42 U.S.C.

§ 3613(a)(1)(A), and given the Court's reasoning in *Thompson*, this court concludes that it

must apply the zone of interests test when addressing whether FHA plaintiffs have standing.[22]

_____

[21]The Fifth Circuit recently stated that "the zone-of-interests test is an additional
standing requirement only in cases seeking review of agency decisions under the APA."
*Servicios Azucareros de Venezuela, C.A., et. al. v. John Deere Thibodeaux, Inc.*, ___ F.3d
___, 2012 WL 6200374, at *6 (5th Cir. Dec. 13, 2012).  This is true insofar as the zone of
interest test is "most usefully understood as a gloss on the meaning of [APA] § 702," *Clarke
v. Securities Industry Ass'n*, 479 U.S. 388, 400 n.16 (1987), and therefore applies to cases
brought under the APA.  Yet as the panel implicitly acknowledged in *Servicios*, there are
some instances when the zone of interests test applies to claims brought under other federal
statutes.  *See Servicios*, 2012 WL 6200374, at *6 ("Because Servicios has not brought its
claim under a federal statute, constitutional provision, or the APA, the zone-of-interests test
is not applicable to this case.").  This is so when a statute invokes § 702's language and
therefore the zone of interests test.  *See Thompson*, 131 S.Ct. at 870 ("We hold that the term
'aggrieved' in Title VII incorporates [the zone of interests] test.").

[22]Since *Thompson*, a split has begun to develop among the lower courts.  Some courts
continue to hold that only Article III standing is required, without addressing or even
mentioning *Thompson*.  *See, e.g., Equal Rights Ctr. v. Post Props. Inc.*, 633 F.3d 1136, 1138
(D.C. Cir. 2011); *Mazzocchi v. Windsor Owners Corp.*, 2012 WL 3288240, at *6 (S.D.N.Y.
Aug. 6, 2012).  The courts citing *Thompson* have split regarding its impact.  At least two
recognize that *Thompson* requires a prudential standing inquiry in at least some FHA cases.
*See Hous. Opportunities Project for Excellence, Inc., v. Wedgewood Condo. Ass'n*, 2012 WL
4193969, at *4 (S.D. Fla. Sept. 19, 2012); *Levy v. Trent Motel Assocs., L.P.*, 2011 WL

2

Applying the zone of interests test, the court holds that plaintiffs do not have standing to bring claims that their minority tenants' FHA rights were violated. The Supreme Court has "described the 'zone of interests' test as denying a right of review 'if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Thompson*, 131 S.Ct. at 870 (quoting *Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 399-400 (1987)). Although *Thompson* reiterated that a person need not have been the object of discriminatory practices to have standing, *id.*, the Supreme Court's cases involve plaintiffs who sued to attain the benefits of integrated living, *see Trafficante*, 409 U.S. at 209-10 (describing injury alleged by tenants of building purportedly discriminated against on basis of race as "the loss of important benefits from interracial associations"); *Gladstone*, 441 U.S. at95, 113-15 (describing, *inter alia*, injury alleged by homeowners in neighborhood suffering from racial steering as "depriv[ation] of the social and professional benefits of living in an integrated society); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 376 (1982) (describing injury alleged by local homeowners who were testers as deprivation of the benefits of "interracial

---

3803647, at *6 (E.D. Pa. Aug. 26, 2011) (stating that plaintiff "may bring suit under the FHA only to recover for his own injury, so long as the injury falls within the zone of interests protected under the FHA," and citing *Thompson*). At least one court has expressly stated that, despite *Thompson*'s language, the FHA does not require prudential standing. *See Equal Rights Ctr. v. Equity Residential*, 798 F.Supp.2d 707, 718 n.4 (D. Md. 2011) (declining to consider prudential standing because the Supreme Court "did not overrule *Trafficante*'s holding that standing under the FHA extends to the full limits of Article III."). This court will revisit today's holding if warranted by developments in the case law.

associations"). In the present case, plaintiffs are merely using an alleged discriminatory impact on minority tenants as the basis for complaining about defendants' business practices. There is no allegation that plaintiffs suffer from a lack of interracial association as a result. Plaintiffs have therefore failed to show that they are within the FHA's zone of interests. The statute's purpose is to remedy discrimination in housing, not to allow property owners to assert claims under the guise of another's FHA rights.

D

Even if plaintiffs have standing, they failed to plead facts that enable the court to draw the reasonable inference that defendants' conduct had either a discriminatory effect or a discriminatory intent. *See Artisan/Am. Corp. v. City of Alvin, Tex.*, 588 F.3d 291, 295 (5th Cir. 2009) (holding that FHA claim "may be established not only by proof of discriminatory intent, but also by proof of a significant discriminatory effect."); *Reece v. Countrywide Home Loans, Inc.*, 2008 WL 4559809, at *2 (N.D. Tex. Oct. 10, 2008) (O'Connor, J.) ("Race discrimination claims brought pursuant to the ECOA employ the same burden-shifting analysis conducted in Title VII cases.") (citing *Curley v. JP Morgan Chase Bank NA*, 2007 WL 1343793 (W.D. La. May 7, 2007), *aff'd*, 261 Fed. Appx. 781 (5th Cir. 2008)).

Plaintiffs make only conclusory allegations of discriminatory intent. They aver that defendants "did not treat them in the same manner as they would have treated" non-minorities. 3d Am. Compl. ¶ 203. Without supporting factual allegations, this amounts to nothing more than a "mere suspicion or belief that [plaintiffs] suffered race-based discrimination, [which] is simply insufficient to maintain this action." *Reece*, 2008 WL

4559809, at *3.

Plaintiffs alternately allege discriminatory effect.  But while plaintiffs plead the specific actions that harmed them and their minority residents, they do not allege any broader policies or practices that, while facially neutral, have a discriminatory effect.  To state a plausible claim, plaintiffs must allege not merely "a single act or decision by that defendant [having] a significantly greater impact on members of a protected class, but instead . . . a policy, procedure, or practice specifically identified by the plaintiff [as having] a significantly greater discriminatory impact on members of a protected class." *Simms v. First Gibraltar Bank*, 83 F.3d 1546, 1555 (5th Cir. 1996).[23]  Otherwise, any breach of a credit contract or housing agreement to the detriment of a minority would constitute an ECOA or an FHA violation, respectively.  Plaintiffs fail to state a claim because they do not provide factual allegations of policies that disparately impact minorities, and using the term in a conclusory manner does not make it so.  *See Ng v. HSBC Mortg. Corp.*, 2010 WL 889256, at *12 (E.D.N.Y. Mar. 10, 2010) ("The plaintiff's factual allegations with respect to the disparate impact claim amount to little more than use of the legal term *disparate impact*.").

Accordingly, the court dismisses plaintiffs' claims under the ECOA and the FHA.

---

[23]Plaintiffs object to applying this language at the Rule 12(b)(6) stage because *Simms* "determined that the Plaintiff had failed to provide sufficient evidence *at trial* of discriminatory intent or impact, not on a Motion to Dismiss."  Ps. 6-25-12 Br. 24 (italics substituted for bold font).  This difference is immaterial.  The distinction between the two stages is that, at the motion to dismiss stage, plaintiffs need only satisfy a pleading standard when alleging there was a policy or practice with a discriminatory impact; at trial, plaintiffs must introduce sufficient *evidence* of such a policy or practice for a reasonable jury to find that the practice in fact had a discriminatory impact.

XI

The court next considers plaintiffs' claim that defendants violated the TTLA.

A

The TTLA imposes civil liability for theft.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 134.003(a) (West 2011).  Theft is defined as "unlawfully appropriating property or unlawfully obtaining services."  *Id.* at § 134.002(2).  Plaintiffs allege that defendants "unlawfully appropriated property" by "orchestrating a lock box on the properties when not authorized to do so" and sweeping money from plaintiffs account, "retain[ing] insurance proceeds," "retain[ing] excess tax funds," and "otherwise assum[ing] control over funds." 3d Am. Compl. ¶ 202 (second ¶ 202).  Defendants move to dismiss, contending that the appropriation was lawful under the parties' contracts.[24]

B

Whether plaintiffs have stated a claim turns on whether they have adequately pleaded that defendants' appropriation was unlawful.  Therefore, the claim is dependent on plaintiffs' other claims premised on the imposition and administration of the lock box.  Because plaintiffs have not stated a claim for which relief can be granted premised on the administration of the lock box, the court dismisses the component of plaintiffs' TTLA claim

_____

[24]CWCapital also maintains that the claim should be dismissed based on "Plaintiffs' lack of factual allegations regarding CWCapital's purported involvement in the 'theft' of Plaintiffs' money."  CWCapital 6-7-12 Br. 21.  Plaintiffs have repeatedly referred to "defendants'" theft and control, and they have in their TTLA claim asserted that "defendants' one or more" performed the complained of acts.  3d Am. Compl. ¶ 202-03.  This is sufficient to satisfy Rule 8(a).

- 40 -

that is dependent on this claim.  Because plaintiffs have stated a claim for breach of contract premised on unlawful imposition of the lock box arrangement, they have pleaded a plausible claim for relief under the TTLA regarding imposition of the lock box.  *But see infra* § XVI(C) (addressing affirmative defense of release).  The court therefore dismisses in part plaintiffs' TTLA claim.

## XII

The court now addresses plaintiffs' claim that defendants filed false or fraudulent documents.

## A

Plaintiffs allege that defendants violated Tex. Civ. Prac. & Rem. Code Ann. §§12.001-12.007 (West Supp. 2012-13), which prohibit filing documents that have been altered, tampered with, or otherwise changed from their original form.  They assert that knowingly and intentionally filing documents purportedly notarized by one party, but altered by another party without the consent or knowledge of either the affiant or the notary, and/or posting a foreclosure notice by a party who is a stranger to a deed of trust for the property in question violates Tex. Pen. Code Ann. § 37.10(a)(1) in knowingly making a false entry in, or false alteration of, a governmental record.  3d Am. Compl. ¶ 205.

Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a) (West Supp. 2012-13)—the Texas fraudulent lien statute—provides:

A person may not make, present, or use a document or other record with

> (1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;
>
> (2) intent that the document or other record be given the same legal effect as a court record or document of a court created by or established under the constitution or laws of this state or the United States or another entity listed in Section 37.01, Penal Code, evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and
>
> (3) intent to cause another person to suffer:
>> (A) physical injury;
>>
>> (B) financial injury; or
>>
>> (C) mental anguish or emotional distress.

To establish a fraudulent-lien claim, the plaintiff must prove that "(1) the defendant made, presented, or used a document with knowledge that it was a fraudulent lien, (2) the defendant intended that the document be given legal effect, and (3) the defendant intended to cause plaintiff physical injury, financial injury, or mental anguish." *Merritt v. Davis*, 331 S.W.3d 857, 860-61 (Tex. App. 2011, pet. denied) (citing *Preston Gate, LP v. Bukaty*, 248 S.W.3d 892, 896-97 (Tex. App. 2008, no pet.)).

B

The court holds that plaintiffs have failed to state a claim on which relief can be granted based on the notarized documents. Plaintiffs allege that Thompson (defendants' corporate representative) testified at a state court hearing that two documents were altered at his direction, without the approval of the notary or affiant, filed in the Dallas County deed

records, and used by US Bank to establish the right to intervene in this lawsuit, which was then pending in state court.  Plaintiffs assert that, although US Bank's purpose in these documents is not absolutely clear, it appears that legal counsel responded to direction from Thompson [of CW Asset] to file the documents modifying the sworn statements of CWCapital's Vice President regarding assignment of note interests, which essentially reversed any prior actual or purported assignment of lender/noteholder status from CWCapital to CW Mortgage.

Plaintiffs have failed to plead, however, that defendants intended by this conduct to cause plaintiffs physical injury, financial injury, or mental anguish, which is an essential element of the claim.  *See, e.g., Preston Gate*, 248 S.W.3d at 896-97 (holding, *inter alia*, that plaintiff must show that defendant intended to cause plaintiff physical injury, financial injury, or mental anguish).  Even construing plaintiffs' third amended complaint in the light most favorable to them, accepting as true all well-pleaded factual allegations, and drawing all reasonable inferences in their favor, plaintiffs allege only that the documents were meant to allow US Bank to intervene in the lawsuit.  They make no effort to plead, even in a conclusory manner, that defendants intended by this conduct to injure plaintiffs.  *See* 3d Am. Compl. ¶¶ 204-06.

## C

The court holds that plaintiffs have also failed to state a claim on which relief can be granted based on the foreclosure notices, at least for the reason that the third amended complaint fails to plausibly plead that CW Mortgage was not the noteholder when it noticed

the foreclosures.

In response to defendants' motions to dismiss, plaintiffs allege contradictions in multiple documents regarding who is the noteholder, but they have failed to plausibly plead that the contradictions were anything but minor. Plaintiffs allege that Wells Fargo is listed as the noteholder in the Modification Agreement. In fact, it states "Wells Fargo Bank, N.A., as Grantor Trust Trustee, in trust for the registered holders of CWCapital Securities I, L.L.C. (the 'Noteholder')." CWCapital 6-7-12 App. 157. Plaintiffs do not appear to allege that "CWCapital Securities I" is a different entity from "CWCapital Mortgage Securities I."[25] And other documents list CW Mortgage as the noteholder.

Plaintiffs also assert that it was unclear who was a noteholder because the plea in intervention and emergency request for appointment of receiver filed in state court on August 29, 2011 stated that US Bank was the noteholder. But the third amended complaint does not contain sufficient facts to support a conflict. Plaintiffs allege that the plea in intervention referred to US Bank as "U.S. Bank, N.A., as successor to Wells Fargo Bank, N.A., as Indenture Trustee under that certain Indenture, dated as of May 10, 2006, by and among CWCapital COBALT II, Ltd, CWCapital COBALT II, LLC, CWCapital Investments LLC and Wells Fargo Bank, National Association, for the benefit of the Related Noteholders." 3d Am. Compl. ¶ 36. And plaintiffs at the same time allege that defendants should be judicially estopped from denying the noteholder status of CW Mortgage.

_____

[25]*See* 3d Am. Compl. ¶ 33(d) (paraphrasing Modification Agreement and substituting "CWCapital Mortgage Securities I" for where document said "CWCapital Securities I").

Accordingly, plaintiffs' claim under the Texas fraudulent lien statute is dismissed.

XIII

Plaintiffs also allege a claim under Texas law for civil conspiracy.

In Texas, to establish a civil conspiracy claim, a plaintiff must prove "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983). "[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996).

Because components of at least some of plaintiffs' tort claims survive defendants' motion to dismiss, defendants have failed to demonstrate that the civil conspiracy claim should be dismissed for failure to "plead and prove another substantive tort upon which to base a civil conspiracy claim." *Berry v. Lee*, 428 F.Supp.2d 546, 561-62 (N.D. Tex. 2006) (Fitzwater, J) (quoting *Grizzle v. Tex. Commerce Bank, N.A.*, 38 S.W.3d 265, 285 (Tex. App. 2001), *rev'd in part on other grounds*, 96 S.W.3d 240 (Tex. 2002)). Even so, plaintiffs have failed to plead an object to be accomplished by the purported conspirators. *See* 3d Am. Compl. ¶ 207. And their allegations regarding other elements are conclusory. *See id.* at ¶¶ 149-151 and 207 (alleging without factual support that "[a]t all material times Defendants, one or more, conferred or otherwise agreed or cooperated to Plaintiff's disadvantage" and are thus liable "whether or not acting without full knowledge of the impact of the acts of

other Defendants").

The court therefore dismisses plaintiffs' claim for civil conspiracy.

XIV

In addition to their claims, plaintiffs request declaratory relief under the Texas and Federal Declaratory Judgment Acts. The court need only consider their requests under the federal Declaratory Judgment Act ("DJA"), 28 U.S.C. §§ 2201, 2202.[26]

A

The DJA does not create a substantive cause of action. *See Lowe v. Ingalls Shipbuilding, A Div. of Litton Sys., Inc.*, 723 F.2d 1173, 1179 (5th Cir. 1984). Instead, it is merely an early means of adjudicating a claim arising under other substantive law. *Collin Cnty., Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN)*, 915 F.2d 167, 170 (5th Cir. 1990).

"Federal courts have broad discretion to grant or refuse declaratory judgment." *Kougl*, 2005 WL 1421446, at *4 (citing *Torch, Inc. v. LeBlanc*, 947 F.2d 193, 194 (5th Cir. 1991)). "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and substantial discretion in deciding whether to declare the rights

---

[26]Although plaintiffs seek declaratory judgment under both the Texas and federal Declaratory Judgment Acts, "[w]hen a declaratory judgment action filed in state court is removed to federal court, that action is in effect converted into one brought under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202." *Redwood Resort Props., L.L.C. v. Holmes Co.*, 2007 WL 1266060, at *4 (N.D. Tex. Apr. 30, 2007) (Fitzwater, J.). Accordingly, their requests for declaratory relief are treated as if made under the federal Declaratory Judgment Act.

of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995).  The DJA is "an authorization, not a command." *Pub. Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112 (1962) (per curiam).  Federal courts are competent to declare rights, but they have no duty to do so.  *Id.*  "Although 'the district court's discretion is broad, it is not unfettered.'" *St. Paul Ins. Co. v. Trejo*, 39 F.3d 585, 590 (5th Cir. 1994) (quoting *Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc*., 996 F.2d 774, 778 (5th Cir. 1993)).  The court cannot dismiss a declaratory judgment action "on the basis of whim or personal disinclination." *Id.* (quoting *Travelers*, 996 F.2d at 778).

### B

The court declines to consider plaintiffs' requests for declaratory judgment.  Plaintiffs seek declaratory judgment regarding the rights of the parties involved in this litigation under each contract, and also regarding the enforceability of each contract. *See* 3d Am. Compl. ¶¶ 155-156.  Although plaintiffs argue that such relief is crucial to resolve the uncertainty surrounding "conflicting claims and assertions" detailed in their third amended complaint, these issues will be resolved through other claims in the case. *See Kougl*, 2005 WL 1421446, at *4 (denying as redundant a declaratory judgment claim seeking contract interpretation where this would be resolved as part of breach of contract claim).  Furthermore, plaintiffs' requests for declaratory relief essentially seek a remedy for alleged past wrong, and there is no indication that entering declaratory relief would "help[] the parties avoid damages that might otherwise accrue." *Collin Cnty.*, 915 F.2d at 170.

Accordingly, plaintiffs' requests for declaratory relief are dismissed.

- 47 -

XV

The court now considers whether defendants are entitled to dismissal under Rule 12(b)(6) based on their affirmative defenses of release and limitations. "Although dismissal under Rule 12(b)(6) is ordinarily determined by whether the facts alleged in the complaint, if true, give rise to a cause of action, a claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings." *Smallwood v. Bank of Am.*, 2012 WL 32654, at *2 (N.D. Tex. Jan. 6, 2012) (Fitzwater, C.J.) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)); *see also White v. Padgett*, 475 F.2d 79, 82 (5th Cir. 1973) (holding that claim is "subject to dismissal under Rule 12(b)(6) . . . when [an] affirmative defense clearly appears on the face of the complaint."). Defendants are not entitled to dismissal under 12(b)(6) unless plaintiffs have "plead [themselves] out of court." *Hall v. Kone, Inc.*, 2011 WL 3510861, at *2 (N.D. Tex. Aug. 10, 2011) (Fitzwater, C.J.) (quoting *Hooker v. Dall. Indep. Sch. Dist.*, 2010 WL 4025877, at *7 (N.D. Tex. Oct.13, 2010) (Fitzwater, C.J.)). "In deciding a motion to dismiss the court may consider documents attached to or incorporated in the complaint and matters of which judicial notice may be taken." *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 379 (5th Cir. 2003).

XVI

The court first considers the affirmative defense of release.

A

"Under Texas law, release is an affirmative defense on which [defendants] will have the burden of proof at trial." *Cont'l Cas. Co. v. St. Paul Fire & Marine Ins. Co.*, 2006 WL 984690, at *1 (N.D. Tex. Apr. 14, 2006) (Fitzwater, J.) (citing *MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 64 (Tex. App. 2005, pet. denied)). "A release, valid on its face, is a complete bar to any later action based upon matters covered in the release unless the release is set aside." *Westfield Dev., Inc. v. Rubashkin*, 2007 WL 491115, at *2 (Tex. App. Feb. 15, 2007, no pet.) (mem. op.) (internal quotation marks omitted) (quoting *Winkins v. Frank Winther Invs., Inc.*, 881 S.W.2d 557, 559 (Tex. App. 1994, no writ)).

When construing contracts under Texas law, the court is "to ascertain and give effect to the intentions of the parties as expressed in the contract[s]." *Chapman v. Olbrich*, 217 S.W.3d 482, 488 (Tex. App. 2006, no pet.) (citing *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998)). "In doing so, the court must examine and consider the entire writing in an effort to harmonize and give effect to all contractual provisions, so that none will be rendered meaningless." *Hoffman v. L&M Arts*, 774 F.Supp.2d 826, 832 (N.D. Tex. 2011) (Fitzwater, C.J.). "A contractual provision is ambiguous when its meaning is uncertain and doubtful or if it is reasonably susceptible to more than one interpretation." *Id.* at 833. Whether a contract is ambiguous is a question of law for the court. *Heritage Res.,*

- 49 -

*Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996).

### B

Defendants maintain that plaintiffs released any claims premised on the lock box allegations because the release included in the Modification Agreement released all claims related to

> (i) the loan; (ii) the Loan Documents; (iii) the Property; (iv) the [Modification] Agreement; (v) any and all other agreements, documents or instruments referenced herein or in the Loan Documents or related hereto or thereto; (vi) any defenses as to the enforcement of the Loan Documents; (vii) any act, omission, negligence or breach of duty by the Noteholder or any previous beneficiary of the Deed of Trust; or (viii) any claims of lender liability.

CW Mortgage et al. 6-4-12 Br. 8 (quoting Verified Original Pet. [Modification Agreement ¶ 7]).  Plaintiffs respond that, despite this release, the claims related to the lock box were not released because the later-dated Forbearance Agreement included a different release that excepted a list of factual allegations, including the lock box.  They posit that, because the Forbearance Agreement postdates the Modification Agreement, the Forbearance Agreement controls, or at least there is an ambiguity as to whether the claim is released.  Defendants reply that the later release in the Forbearance Agreement is immaterial because all claims were "irrevocably and unconditionally" released in the earlier Modification Agreement, and the Forbearance release did not explicitly revive the claims.

### C

The court concludes that the release in the Modification Agreement applies to release

all claims available at the time of that agreement, and the release in the Forbearance Agreement excepts only specified claims arising after the parties entered the Modification Agreement.

It is well established under Texas law that "instruments pertaining to the same transaction may be read together to ascertain the parties' intent." *Fort Worth Indep. Sch. Dist. v. Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000).[27] *See also Veal v. Thomason*, 138 Tex. 341, 159 S.W.2d 472, 475 (1942); *Braniff Inv. Co. v. Robertson*, 124 Tex. 524, 81 S.W.2d 45, 50 (1935)). "Documents 'pertaining to the same transaction may be read together,' even if they are executed at different times and do not reference each other, and 'courts may construe all the documents as if they were part of a single, unified instrument.'" *In re Laibe Corp.*, 307 S.W.3d 314, 317 (Tex. 2010) (quoting *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840). To determine whether documents are part of the same transaction, the court looks to whether the transaction's intended goal could be accomplished without a certain document. *See Bd. of Ins. Comm'rs v. Great S. Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803, 809 (1951) ("All of the instruments were a necessary part of the same transaction, without any one of which the transaction was not complete."). The court decides as a matter of law

---

[27]Some Texas courts of appeals have construed multiple documents together when they pertain to the same "subject matter" and the latest document "does not specify whether or to what extent it is intended to operate in discharge or substitution." *The Courage Co. v. The Chemshare Corp.*, 93 S.W.3d 323, 333 (Tex. App. 2002, no pet.) (citing *Cooper v. Supercinski*, 700 S.W.2d 239, 243 (Tex. App. 1985, writ ref'd n.r.e.)). The court concludes that, under Texas law, this rule of construction is intended to apply to multiple documents that are part of the "same transaction" rather than multiple documents that merely pertain to the same "subject matter."

whether multiple documents comprise a single contract memorializing a single transaction. *City of Hous. v. Williams*, 353 S.W.3d 128, 137 (Tex. 2011) (citing *Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 840).

The third amended complaint and the attached contracts conclusively show that the Modification Agreement and the Forbearance Agreement are not part of the same transaction. The Modification Agreement was intended to alter the Note's maturity date by 13 months and to modify concomitant provisions. The Forbearance Agreement, on the other hand, was intended to prevent the noteholder from exercising certain rights under the contract for a period of time, but it was not intended to "constitute a modification or amendment to the Loan Documents[.]" CWCapital 6-17-12 App. 151. Plaintiffs have not pleaded any facts, and the agreements contain no language, indicating that the Modification Agreement's intended goal could not be accomplished without the Forbearance Agreement. This contrasts with cases in which the Supreme Court of Texas has determined that multiple documents comprised a written contract. *See e.g., Fort Worth Indep. Sch. Dist.*, 22 S.W.3d at 836-38, 840 (reading two ordinances and related documents together as single agreement where agreement between city, independent school district, and corporation would not be effective but for each document); *Jones v. Kelley*, 614 S.W.2d 95, 98 (Tex. 1981) (holding that multiple documents between different parties were part of one transaction because transaction was for sale of entire tract of land, which would be incomplete without referencing certain documents); *Veal*, 159 S.W.2d at 475 (holding that multiple documents were part of one transaction where multiple land-owners made unitized lease covering group

of contiguous tracts of land as one unified block, but for convenience executed separate instruments that were identical in terms and described all tracts of land in unitized block). *See also Jim Walter Homes, Inc. v. Schuenemann*, 668 S.W.2d 324, 327 (Tex. 1984) (reading a "Building Contract," "Installment Mechanic's Note," and "Mechanic's Lien Contract With Power of Sale" all executed on the same day as part of single transaction for construction of house). Moreover, assuming *arguendo* that the Modification Agreement and the Forbearance Agreement are part of the same transaction, they should not be read together because they do not share the same primary purpose. *Cf. Jones*, 614 S.W.2d at 99 ("Looking at the complete transaction it was the clear intent of both the [parties] that the execution of the four documents was for the primary purpose of conveying all the subject property[.]").

The doctrine under which different documents are interpreted together as part of the same contract is "simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation." *Miles v. Martin*, 159 Tex. 336, 321 S.W.2d 62, 65 (1959). Because the Forbearance Agreement does not alter the original loan documents, the goal of each agreement can be accomplished without the other, and each agreement has a separate primary purpose, the court concludes as a matter of law that the Modification Agreement and the Forbearance Agreement are not intended to be read together and must therefore be interpreted separately. This means that the release in the Modification Agreement is not affected by the subsequent release in the Forbearance Agreement. Therefore, any claims accruing after March 9, 2009 (the effective date of the Modification Agreement) and not excepted by Exhibit A, as well

as any claims accruing after May 18, 2009 (the date the parties entered into the Forbearance Agreement) are not released. Defendants' motion is granted in part and denied in part based on the affirmative defense of release.

D

Because the release from the Modification Agreement applies, the court now considers plaintiffs' argument that defendants are judicially estopped from invoking the release because they earlier asserted that US Bank was the noteholder, while the Modification and Forbearance Agreements list CW Mortgage as the noteholder.

"[J]udicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." *Reed v. City of Arlington*, 650 F.3d 571, 573-74 (5th Cir. 2011) (en banc). The court invokes this equitable doctrine at its discretion in order to "protect the integrity of the judicial process," *id.* at 574, and prevent parties from "playing fast and loose with (the courts) to suit the exigencies of self interest." *Brandon v. Interfirst Corp.*, 858 F.2d 266, 268 (5th Cir. 1988) (internal quotation marks and citation omitted). The doctrine applies only when "(1) the position of the party to be estopped is plainly inconsistent with its previous position, (2) the court accepted the previous position, and (3) the party did not act inadvertently." *United States v. BNP Paribas SA*, ___ F.Supp.2d ___, 2012 WL 3234233, at *4 (S.D. Tex. Aug. 6., 2012) (citing *Reed*, 650 F.3d at 574).

Plaintiffs do not allege that the court accepted defendants' previous position. Rather, they maintain only that US Bank filed a plea in intervention in state court stating that it was

assigned the note.  Without alleging that the state court accepted this position by deciding an issue on this basis, judicial estoppel is inapplicable.

XVII

The court next addresses the affirmative defense of limitations and whether CWCapital has established that plaintiffs' claims for negligent misrepresentation and under the ECOA, FHA, and TTLA are time-barred.

A

Each claim at issue is subject to a two-year statute of limitations.[28]  Although the parties agree that plaintiffs filed suit in June 2010, CWCapital argues it was not served until January 2012.  It offers as support the Texas citation that is included as an exhibit in its appendix in support of its motion to dismiss plaintiffs' third amended complaint.  Although plaintiffs' third amended complaint refers neither to the citation nor to when plaintiffs were served, "[i]n deciding a motion to dismiss the court may consider . . . matters of which judicial notice may be taken."  *United States ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citation omitted).  This includes taking "judicial[] notice [of] a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined

---

[28]Tex. Civ. Prac. & Rem. Code Ann. § 16.003 (West Supp. 2012-13) (negligent misrepresentation and TTLA); 15 U.S.C. § 1691e(f) (ECOA); 42 U.S.C. § 3613(a)(1)(A) (FHA).  The ECOA limitations period was amended in 2010 and is now five years.  Even if that change applies to the facts of this case, it does not change the outcome because the court holds that, even under a two-year limitations period, plaintiffs' ECOA claim is not time-barred.

from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  The date the court clerk issued the citation, January 20, 2012, is not subject to reasonable dispute because it can be obtained through the records of the Dallas County clerk's office, the accuracy of which cannot be reasonably questioned.[29]

### B

The court first considers whether the statute of limitations bars plaintiffs' state-law claims.  When addressing a state-law claim, a federal court follows the state's service of process laws in determining when an action is commenced for the purpose of tolling the statute of limitations unless the state's service law directly conflicts with a federal rule. *Walker v. Armco Steel Corp.*, 446 U.S. 740, 752-53 (1980).  Under Texas law, plaintiffs must have brought suit within the applicable limitations period, which means that they must have filed their petition within the limitations period and exercised due diligence in serving CWCapital with citation.  *See Gant v. DeLeon*, 786 S.W.2d 259, 260 (Tex. 1990) (per curiam).  If plaintiffs filed their "petition within the limitations period, but [did] not serve the defendant until after the statutory period ha[d] run, [their] suit is time barred unless it is shown that [they] exercised diligence." *Rodriguez v. Tinsman & Houser, Inc.*, 13 S.W.3d 47, 49 (Tex. App. 1999, pet. denied) (citing *Grant*, 786 S.W.2d at 260).  To toll the statute of limitations, a plaintiff must not only file suit within the limitations period, but must also exercise diligence in procuring the issuance and service of citation.  *Gant*, 786 S.W.2d at

---

[29]Neither side contests that service did not occur until late January 23, 2012.

260.  Once the affirmative defense of limitations is asserted, the burden is on plaintiffs to show diligence.  *Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 830 (Tex. 1990).

Plaintiffs maintain that, in determining whether their claims are time-barred, the relevant date is the date on which they filed their original petition, because they exercised due diligence in procuring service of the citation, and therefore the statute of limitations was tolled.  "The existence of due diligence is usually a fact question determined by a two-prong test: (1) whether the plaintiff acted as an ordinarily prudent person would have acted under the same or similar circumstances; and (2) whether the plaintiff acted diligently up until the time the defendant was served."  *Id.* at 754 (citing *Hodge v. Smith*, 856 S.W.2d 212, 215 (Tex. App. 1993, writ denied)).  "A lack of due diligence can be found as a matter of law if the plaintiff offers no valid excuse for lack of service[.]").  *Zacharie v. U.S. Natural Res. Inc.*, 94 S.W.3d 748, 754 (Tex. App. 2002, no pet.).

The court has determined from plaintiffs' third amended complaint and from the matters of which judicial notice may be taken that plaintiffs cannot satisfy their burden. Plaintiffs maintain that they were diligent because, although they did not attempt to serve CWCapital for 19 months after the original petition was filed, they had good cause for not doing so because they were led to believe that CWCapital was irrelevant to the causes pleaded in the original petition.  But plaintiffs neither allege nor even argue that they exercised diligence to *actually serve* CWCapital.  Plaintiffs actually obtained citation and decided not to effect service.  The Texas rule is designed to excuse parties who, despite their diligence, are unable to serve the defendant rather than those who choose not to do so.  *See*

- 57 -

*id.* at 754 ("The explanation must involve diligence in seeking service of process." (citing *Rodriguez*, 13 S.W.3d at 49)); *Grant v. C.R. England, Inc.*, 2011 WL 835880, at *3 (S.D. Tex. Mar. 8, 2011) ("Due diligence is assessed by examining the length of time taken to complete service, and the effort expended by the plaintiff." (citing *Carter v. MacFadyen*, 93 S.W.3d 307, 313 (Tex. App. 2002, pet. denied)).  Because plaintiffs' excuse for failing to effect service does not qualify as diligent conduct, the court concludes as a matter of law that they did not exercise due diligence and that the statute of limitations was not tolled.

## C

Plaintiffs contend that the discovery rule nevertheless makes their negligent misrepresentation claim timely.[30]  Under the discovery rule, which applies to claims of negligent misrepresentation, *see Camp Mystic, Inc. v. Eastland*, ___ S.W.3d ___ , 2012 WL 2334604, at *6 (Tex. App. June 20, 2012, no pet. h.) (citing *Matthiessen v. Schaefer*, 27 S.W.3d 25, 31 (Tex. App. 2000, pet. denied)),[31] a cause of action does not accrue until plaintiffs "knew or, exercising reasonable diligence, should have known of the facts giving rise to a cause of action."  *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998). "Knowledge of injury initiates the accrual of the cause of action and triggers the putative claimant's duty to exercise reasonable diligence to investigate the problem, even if the

---

[30]Plaintiffs do not allege that they served process on CWCapital within two years of the events giving rise to their negligent misrepresentation claim.

[31]*See also In re Sunpoint Secs.* 377 B.R. 513, 551-52 (Bankr. E.D. Tex. 2007) (collecting cases).

claimant does not know the specific cause of the injury or the full extent of it." *Exxon Corp.*

*v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 209 (Tex. 2011) (citing *PPG Indus., Inc. v.*

*JMB/Houston Ctrs. Partners Ltd.*, 146 S.W.3d 79, 93-94 (Tex. 2004)).   In the present case,

plaintiffs allege only that they did not realize that CWCapital might have caused their injury

until hearing Thompson's testimony.   The third amended complaint is devoid of any factual

allegations to support the proposition that plaintiffs neither knew nor could have known of

the injury itself.   Plaintiffs cannot avoid the limitations defense based on the discovery rule.

## D

Finally, plaintiffs argue that "even if statutes of limitations provided a defense . . . for

actions prior to January 23, 2010, limitations would not bar [their] . . . TTLA claims . . . after

that date, as they occurred within two years of Plaintiffs' service of process[.]"  Ps. 6-28-12

Br. 15-16.   Because the court is dismissing all TTLA claims that do not pertain to the

imposition, as opposed to the administration, of the lock box, *see supra* § XI, which occurred

in late 2008, the only remaining TTLA claims are time-barred.[32]

## E

The court now turns to plaintiffs' ECOA and FHA claims.   "[I]n a federal cause of

action the question of when and how the applicable statute of limitations has been satisfied

must be determined as a matter of federal law."  *Gebru v. Sears, Roebuck & Co.*, 2009 WL

2705508, at *3 (N.D. Tex. Aug. 28, 2009) (Sanderson, J.) (internal quotation marks and

---

[32]The court addresses the release of lock box claims *supra* at § XVI(C).

citation omitted); *Parker v. Am. Airlines, Inc.*, 2008 WL 2811320, at *5-6 (July 22, 2008) (Means, J.).  The federal rules state that "[a] civil action is commenced by filing a complaint with the court."  Rule 3.  Plaintiffs' ECOA claim was filed in their June 2010 original petition and therefore is not time-barred.

Plaintiffs' FHA claim, however, was not raised until their first amended petition, which was filed in late January 2012.  Accordingly, any FHA claims that accrued before late January 2010—two years before plaintiffs filed their first amended petition—would be time-barred unless they relate back to an earlier pleading.

> [Rule] 15(c) provides that, in certain circumstances, amendments to pleadings relate back to the date of the original pleading.  One of those circumstances is when the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.  Thus, the focus is not the caption given a particular cause of action, but the underlying facts upon which the cause of action is based.  The purpose of the rule is accomplished if the initial complaint gives the defendant fair notice that litigation is arising out of a specific factual situation.

*Johnson v. Crown Enter., Inc.*, 398 F.3d 339, 342 (5th Cir. 2005) (citations, quotation marks, and ellipsis omitted).  Plaintiffs original petition sufficiently set out facts underlying plaintiffs' claims that defendants discriminated against them in providing credit and forbearance, and that defendants wrongfully triggered the lock box provision.  Although the details of the alleged discrimination were not fleshed out, plaintiffs provided defendants fair notice that litigation was arising from those factual situations.  Plaintiffs' FHA claim concerning discriminatory treatment in the extension of credit therefore relates back to the date of the

original petition and is not time-barred.[33]  *See Granite State Ins. Co. v. Tyler*, 2010 WL 2756056, at *1-2 (W.D. La. July 9, 2010) (applying Rule 15(c) where original pleading was filed in state court).

## XVIII

The court finally considers whether Aguilar has standing under Texas law to bring each of the state-law claims previously discussed.

The general rule in Texas is that "guarantors do not have standing to bring claims for breach of contract on behalf of the principal debtor." *Compass Bank v. Veytia*, 2011 WL 6046530, at *3 (W.D. Tex. Dec. 5, 2011).[34]  Where a plaintiff is both a shareholder and a guarantor, he lacks standing to sue in a personal capacity where the claim belongs to the corporation. *See, e.g., Corona v. Pilgrim's Pride Corp.*, 245 S.W.3d 75, 78-79 (Tex. App. 2008, pet. denied) (dismissing breach of contract, negligence, fraud, conspiracy to commit fraud, and conversion claims for lack of standing); *Motorola, Inc. v. Chapman*, 761 F. Supp. 458, 460-61 (S.D. Tex. 1991) (limiting plaintiffs' standing to "claims based on wrongs against them personally," which included claims involving guaranties).

---

[33]The court does not consider whether the FHA claims on behalf of tenants are time-barred because they are dismissed for lack of standing and plaintiffs may replead.

[34]This derives from the doctrine that "a corporate shareholder has no individual cause of action for damages caused by a wrong done solely to the corporation." *Haut v. Green Café Mgmt., Inc.*, 376 S.W.3d 171, 177 (Tex. App. 2012, no pet. h.) (citing *Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990)).  Causes of action for injury to the corporation are vested in the corporation, regardless of whether the shareholders are also harmed. *Id.* (citing *Wingate*, 795 S.W.2d at 719).

Because Aguilar is a guarantor and has not stated how any one or more of the generally alleged injuries are personal to him, the court holds that he lacks standing to pursue the state-law claims. As alleged in the third amended complaint, Aguilar was not a party to the contracts allegedly breached;[35] the alleged fraud, negligence, and tortious interference were directed at and injured DT Apartment; the alleged breach of fiduciary duties is premised on a fiduciary relationship between defendants and DT Apartment; and the alleged theft was of DT Apartment's prospective purchaser's identity. Further, although Aguilar participated in many of the events that allegedly give rise to plaintiffs' claims, there is no allegation that he was acting in anything other than a representative capacity or that any injury was personal to him. As a result, Aguilar lacks standing, and his state-law claims are dismissed.

XIX

Although the court is dismissing certain of plaintiffs' claims, it will permit them to replead their claims that have not been released or that are not time-barred. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *In re Am. Airlines, Inc., Privacy Litig.*, 370 F.Supp.2d 552, 567-68 (N.D. Tex. 2005) (Fitzwater, J.) (internal quotation marks and citation omitted). The defects in plaintiffs' claims that have been released or that are time-barred are incurable. But because plaintiffs have not stated

---

[35]He signed the documents in his representative capacity as a principal for DT Apartment.

that they cannot, or are unwilling to, cure the other defects that the court has identified, the court grants them 30 days from the date this memorandum opinion and order is filed to file an amended complaint.  Moreover, allowing plaintiffs to amend their complaint will ensure that the court has employed a fair procedure in raising grounds for dismissal *sua sponte*.  *See supra* note 8.

\* \* \*

For the reasons explained, defendants' motions are granted in part and denied in part, and plaintiffs are granted leave to replead.

**SO ORDERED.**

December 26, 2012.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE