IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

DT APARTMENT GROUP, LP,           §
                                  §
                    Plaintiff,    §
                                  §   Civil Action No. 3:12-CV-0437-D
VS.                               §
                                  §
CWCAPITAL, LLC, et al.,           §
                                  §
                    Defendants.   §

MEMORANDUM OPINION
AND ORDER

    This removed lawsuit is brought by a borrower in response to a lender's actions taken in connection with the financing of, attempt to foreclose on, and efforts to sell four apartment complexes. The court in its prior memorandum opinion and order dismissed most of the claims alleged in plaintiff's third amended complaint, but granted plaintiff leave to replead certain claims. Plaintiff has filed its fourth amended complaint, and defendants now move to dismiss under Fed. R. Civ. P. 8, 9(b), and/or 12(b)(6). For the reasons that follow, the court grants the motions in part, dismissing those claims with prejudice, and denies the motions in part.

I

A

    The background facts of this case are set out in *DT Apartment Group, LP v. CWCapital, LLC*, 2012 WL 6693192, *1-3 (N.D. Tex. Dec. 26, 2012) (Fitzwater, C.J.) ("*DT Apartment I*"). The court will therefore recount only the background facts and procedural

history necessary for this decision.

This lawsuit arises in connection with the financing of, and attempts to sell, four apartment complexes ("the Properties"). Plaintiff DT Apartment Group, LP ("DT Apartment") borrowed funds to purchase the Properties from CWCapital, L.L.C. ("CWCapital"), and the Properties served as collateral. CWCapital Mortgage Securities I, L.L.C. ("CW Mortgage"), CWCapital Asset Management, L.L.C. ("CW Asset"), and U.S. Bank, N.A. ("US Bank") were later involved with the loan, and DT Apartment sues them as well.

The purchase process began in 2006 when CWCapital and DT Apartment began discussing plans for a loan for DT Apartment to purchase the Properties, which had recently been repossessed. DT Apartment alleges that, at this time, a CWCapital representative told it that the loan would involve two stages—a bridge loan followed by a more permanent loan—and that this was memorialized in the CWCapital Floating Rate Loan Application ("the Application"), for which DT Apartment paid $60,000. The Application, which is not in the record, also allegedly stated that CWCapital would service the loan with "unmatched accountability and responsiveness."

The original loan transaction occurred some time later and involved several documents, including a deed of trust ("Deed of Trust"), a promissory note ("Note"), and a Cash Management Agreement ("CMA"). The Note and Deed of Trust each contain a merger clause stating that all previous agreements are superseded by the loan documents.

In 2008 CWCapital notified DT Apartment that it was in default of a required Debt

Service Coverage Ratio ("DSCR") contained in the CMA, and thereby demanded payment of $717,600.67 within three business days. Based on this default, CWCapital asserted that it had the right to invoke a "lock box" arrangement, under which rents are paid into a "Rent Account" and all security deposits are paid into a "Security Deposit Account." DT Apartment avers that, once the lock box arrangement was triggered, defendants[1] used it to completely control the revenues of the Properties; that defendants used the lock box arrangement to "withhold, delay, mishandle, mislabel, and misuse funds," *id.* at ¶ 111; that defendants used the funds for their own purposes; that DT Apartment was allowed "no right of access to or control over the Rent Account," *id.* at ¶ 112; that disbursements were made in defendants' discretion; and that defendants unreasonably denied or unreasonably delayed providing funds, even to maintain or repair the Properties. DT Apartment alleges that this caused it difficulty in renting units for full value and in keeping occupancy rates high, and ultimately "strangled any effective management of the properties." *Id.* at ¶ 117.

Following these events, the parties entered into a Modification and Extension Agreement ("Modification Agreement") and a Forbearance Agreement ("Forbearance Agreement"). The Modification Agreement [which became effective March 9, 2009] altered

---

[1] Throughout the fourth amended complaint, DT Apartment alleges that acts were committed by "defendants, one or more." It asserts that "[g]iven the complexities of the parties and their documents and prior positions, all facts pertaining to the role or functions of various Defendants are pleaded in the alternative . . . . At all material times Defendants, one or more, conferred or otherwise agreed or cooperated to Plaintiff's disadvantage." 4th Am. Compl. ¶¶ 179-80. Accordingly, the court will generally use the term "defendants" to mean "one or more defendants." When it is important to specify which defendant allegedly acted, the court will do so.

the maturity date of the Note from March 9, 2009 to April 8, 2010.  It also included a provision under which DT Apartment released, without exception, its existing claims regarding the Properties and associated loan documents.  Under the later-dated Forbearance Agreement, defendants agreed to forbear from exercising their rights and remedies for a temporary, defined period, and, in exchange, DT Apartment assented to a second release clause that omitted a limited set of specified claims.  In *DT Apartment I* the court held that "the release in the Modification Agreement applies to release all claims available at the time of that agreement, and the release in the Forbearance Agreement excepts only specified claims arising after the parties entered the Modification Agreement." *DT Apartment I*, 2012 WL 6693192, at *22.

After the Note became due, DT Apartment sought to sell the Properties and allegedly received a letter of intent from an interested third party.  DT Apartment alleges that, after defendants learned of the negotiations, Kevin Thompson ("Thompson"), an employee and representative of CW Asset, requested the identity of the purchaser and then invited the prospective purchaser to bid on the Note at foreclosure.  According to DT Apartment, the same thing occurred a second time: it was negotiating to sell the Properties, and Thompson requested the identity of the prospective purchaser for the stated purpose of performing due diligence to facilitate the transaction.  But when CW Asset was provided the requested information, it did not perform due diligence; instead, CW Mortgage sent notice that it intended to foreclose on the Properties and CW Asset offered to sell the Note to the potential buyer.  DT Apartment alleges that defendants intended to harm it by discouraging potential

purchasers.

B

DT Apartment alleges claims for duress, breach of contract, fraud, fraudulent inducement, breach of fiduciary duty, tortious interference with prospective business relations, agency, civil conspiracy, and violations of the Texas Theft Liability Act ("TTLA"). It also asserts duress as a defense to the release contained in the Modification Agreement and Forbearance Agreement. Defendants CW Mortgage, CW Asset, and US Bank move to dismiss each claim under Rules 9(b), 12(b)(6), and/or 12(c). Defendant CWCapital moves to dismiss each claim under Rules 12(b)(6), 8, and/or 9(b). DT Apartment opposes the motions. The court will address both motions together given the substantial overlap between the two.

II

A

"In deciding a Rule 12(b)(6) motion to dismiss, the court evaluates the sufficiency of [plaintiff's] amended complaint by accepting all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Bramlett v. Med. Protective Co. of Fort Wayne, Inc.*, 855 F.Supp.2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and alteration omitted)). To survive defendants' motion to dismiss under Rule 12(b)(6), DT Apartment must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the

- 5 -

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level[.]"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Rule 8(a)(2)) (alteration omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678 (citation omitted).

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." "'A motion brought pursuant to [Rule] 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts.'" *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002) (quoting *Hebert Abstract Co. v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam)). The standard for deciding a motion under Rule 12(c) is the same as the one for deciding a motion to dismiss under Rule 12(b)(6). *See Hoffman v. L & M Arts*, 2011 WL 3567419, at *4 (N.D. Tex. Aug. 15, 2011) (Fitzwater, C.J.) (citing *Gentilello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010)).

B

"Rule 9(b) imposes a heightened pleading standard for fraud claims and requires that a party state with particularity facts supporting each element of fraud." *Turner v. AmericaHomeKey Inc.*, 2011 WL 3606688, at *2 (N.D. Tex. Aug. 16, 2011) (Fitzwater, C.J.) (citing *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)), *appeal docketed*, No. 12-10277(5th Cir. Mar. 13, 2012). "At a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id*. (quoting *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992)). More colloquially, plaintiffs must plead the "who, what, when, where, and how" of the fraud. *Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) (citations omitted). Because Rule 9(b) must be "read in conjunction with [Rule] 8 which requires only a short and plain statement of the claim showing that the pleader is entitled to relief," *id*. (quoting *Landry v. Air Lines Pilots Ass'n International AFL–CIO*, 892 F.2d 1238, 1264 (5th Cir. 1990) (internal quotation marks omitted)), "punctilious pleading detail" is not required, *Steiner v. Southmark Corp.*, 734 F. Supp. 269, 273 (N.D. Tex. 1990) (Fitzwater, J.). "The court's key concern in assessing a complaint under Rule 9(b) is whether the plaintiff seeks redress of specific wrongs or whether the plaintiff instead seeks the opportunity to search out actionable wrongs." *Garcia v. Boyar & Miller, P.C.*, 2007 WL 2428572, at *4 (N.D. Tex.

Aug. 28, 2007) (Fitzwater, J.) (internal quotation marks and citations omitted).[2]

III

The court first addresses DT Apartment's duress claim.

A

Economic duress occurs when one party to a transaction takes "undue or unjust advantage" of the other party's "economic necessity or distress" in order to coerce the other party into making an agreement. *King v. Bishop*, 879 S.W.2d 222, 224 (Tex. App. 1994, no writ). The elements in Texas for an economic duress claim are:

> (1) a threat of an act that the actor had no legal right to do; (2) a threat of such a nature it destroys the other party's free agency; (3) a threat that overcomes the other party's free will and causes it to do what it otherwise would not have done and that it was not legally bound to do; (4) imminent restraint; and (5) no means of protection.

*In re Frank Motor Co.*, 361 S.W.3d 628, 632 (Tex. 2012) (quoting *Flameout Design & Fabrication, Inc. v. Pennzoil Caspian Corp.*, 994 S.W.2d 830, 837 (Tex. App. 1999, no pet.)). "The mere fact that a person enters into a contract with reluctance, or as a result of the pressures of business circumstances, does not, of itself, constitute economic duress invalidating the contract." *ABB Kraftwerke Aktiengesellschaft v. Brownsville Barge & Crane, Inc.*, 115 S.W.3d 287, 294 (Tex. App. 2003, pet. denied).

DT Apartment maintains that it signed the Modification Agreement and the

---

[2]Rule 8 imposes a pleading standard. It is not a rule that authorizes a motion to dismiss.

Forbearance Agreement under economic duress.  It argues that defendants coerced it into signing both agreements and releasing its claims because, if it did not sign, defendants would foreclose on the Properties and DT Apartment would lose its investment.  According to DT Apartment, this threat of foreclosure was the culmination of defendants' wrongful acts, including wrongfully stating that a DSCR condition occurred, wrongfully imposing the lock box arrangement and demanding $717,600.67, and then declaring default when DT Apartment did not pay this sum.

Defendants move to dismiss on multiple grounds.  They posit that they threatened only to foreclose, which they had a legal right to do.  And they maintain that, to the extent DT Apartment sees the threatened foreclosure and the allegedly wrongful imposition of the lock box as inseparable in creating duress, the threatened loss of property was not imminent, and DT Apartment had the ability to protect itself.  Defendants also argue that economic duress cannot stem from a legitimate disagreement over contract interpretation, and that any duress does not void the contract because DT Apartment ratified the agreements by accepting the benefit of the delayed maturity date.

                                                                    B

The court holds that the economic duress claim fails because, under the facts alleged, the threat of foreclosure was not imminent and DT Apartment had time to protect itself through the courts.  Defendants notified DT Apartment of the DSCR occurrence and demanded $717,600.67 within three days in early October 2008.  The Modification Agreement was not signed until approximately 14 months later, in December 2009, although

it was backdated to be effective as of March 2009. DT Apartment does not allege the date the Forbearance Agreement was signed, but the agreement is dated May 18, 2009. Even viewing the facts in the light most favorable to DT Apartment as the nonmovant, approximately seven months elapsed between DT Apartment's default and its first alleged capitulation to defendants' contractual terms. Moreover, DT Apartment has not alleged any facts about when the purported threat occurred or how soon defendants threatened to foreclose. This is insufficient to plausibly allege imminence. *See Lopez v. Garbage Man, Inc.*, 2011 WL 1259523, at \*8-9 (Tex. App. Mar. 31, 2011, no pet.) (mem. op.) (holding there was no imminence where employer threatened employee with job loss or lack of vacation if employee did not sign release, because employee could not establish that threat was made near time of executing release); *cf. In re RLS Legal Solutions, L.L.C.*, 156 S.W.3d 160, 165 (Tex. App. 2005, no pet.) (denying petition for writ of mandamus seeking to compel arbitration based on finding of imminent restraint where plaintiff-employee was told she would not be given her paycheck for past work at end of week unless she signed arbitration agreement), *conditional mandamus writ issued on other grounds*, 221 S.W.3d 629 (Tex. 2002). Furthermore, because of this temporal gap, DT Apartment has not plausibly alleged that it had no means of protection. Texas courts have held that duress cannot occur when the demanding party must resort to court to harm the other party, but may occur when the demanding party can injure the other party without resort to the courts. *See Wright v. Sydow*, 173 S.W.3d 534, 544 (Tex. App. 2004, pet. denied) (citing *Ward v. Scarborough*, 236 S.W. 434, 437 (Tex. Comm'n App. 1922, judgm't adopted)). The court assumes that defendants'

threat did not require that they seek recourse in the courts; yet the lack of a necessary court proceeding for defendants to carry out a threat does not preclude a suit by DT Apartment to prevent that threat.  And the option of bringing such a suit is sufficient to defeat a duress claim.  *See Dall. Cnty. Cmty. Coll. Dist. v. Bolton*, 185 S.W.3d 868, 881, 883 (Tex. 2005) (denying duress claim because student plaintiffs "had the option to avoid [a complained of fee] by adjusting their course loads, *seeking a waiver or injunction* to halt collection of the fees, or seeking other educational opportunities") (emphasis added).  On the facts that DT Apartment alleges, it had time and an opportunity to protect itself through the courts by contesting the validity of defendants' invocation of the DSCR and lock box provisions.

The court therefore concludes that DT Apartment has not alleged a plausible duress claim or defense.[3]  The release therefore applies, as explained in *DT Apartment I*, 2012 WL 6693192, at *22-23.[4]

---

[3]Furthermore, to the extent that DT Apartment's claim about the wrongfulness of defendants' action turns on the interpretation of the loan documents, it does not appear that DT Apartment can maintain a duress claim because, "[i]n the absence of any fiduciary relationship, or any proof of superior knowledge taking advantage of ignorance, [the] expression [of a legal interpretation of a contract] does not amount to duress."  *Dial Temp Air Conditioning Co. v. Faulhaber*, 340 S.W.2d 82, 87 (Tex. Civ. App. 1960, writ ref'd n.r.e.).

[4]No party argues that the court should apply different standards when considering DT Apartment's duress claim and its reliance on duress to oppose the defense to release.

IV

The court next turns to DT Apartment's breach of contract claims.

A

"A breach of contract claim under Texas law requires proof of four elements: (1) the existence of a valid contract, (2) plaintiff's performance of duties under the contract, (3) defendants' breach of the contract, and (4) damages to plaintiff resulting from the breach." *Mesa v. Verizon Bus. Network Servs., Inc.*, 2012 WL 3452696, at *12 (N.D. Tex. Aug. 14, 2012) (Fitzwater, C.J.) (citing *Palmer v. Espey Huston & Assocs.*, 84 S.W.3d 345, 353 (Tex. App. 2002, pet. denied)).  DT Apartment appears to allege three different breach of contract claims: defendants imposed the lock box in violation of the CMA's terms; defendants violated a provision in the Application ostensibly requiring "unmatched accountability and responsiveness" by ignoring or substantially delaying action on DT Apartment's requests; and defendants violated a provision in the CMA providing for the payment of operating funds by denying DT Apartment's detailed funding requests.

B

1

The court holds that DT Apartment's claim that defendants imposed the lock box in violation of the CMA's terms is released for reasons stated in *DT Apartment I*, 2012 WL 6693192, at *22-23.

2

DT Apartment argues that defendants violated the Application's guaranty of

- 12 -

"unmatched accountability and responsiveness." Defendants maintain that this claim should be dismissed because the Note, Deed of Trust, and CMA explicitly supersede the Application. DT Apartment does not respond to this ground for dismissal.

The court concludes that the Application was superseded. The Note and the Deed of Trust each include a merger clause stating that any and all agreements not addressed by the "Loan Documents" are superseded. Each agreement then defines the term "Loan Documents." The Note defines the "Loan Documents" as the Note, the Deed of Trust, the CMA, and "all other documents accepted by Lender for purposes of evidencing, securing, guarantying, modifying or otherwise relating to the indebtedness evidenced hereby." CWCapital App. 34. The Deed of Trust defines the term as

> all and any documents including the Note, [the Deed of Trust, and the CMA] now or hereafter executed by Borrower and/or others and by or in favor of Lender, which evidences, secures or guarantees all or any portion of the payments due under the Note or otherwise is executed and/or delivered in connection with the Note and this Security Instrument . . . .

*Id.* at 53. The question, therefore, is whether the Application qualifies as a Loan Document such that its terms are preserved for DT Apartment's breach of contract claim. The Note's definition of Loan Documents is arguably capacious enough to cover the Application because the Application "relate[s] to [DT Apartment's] indebtedness" by addressing the standard for loan servicing between the parties. *Id.* at 34.[5] Yet the Deed of Trust's definition does not

---

[5]Because the Application is not contained in the record, the court assumes *arguendo* that the Application sets forth such a standard and that the standard is enforceable, if it is not superseded.

include the Application because the Application was executed months before the Deed of Trust; it was not "now or hereafter executed." As a result, even though the Note may preserve the Application by its own terms, the Deed of Trust makes clear that the Application is "null and void and superseded in [its] entirety." CWCapital App. 106.

To the extent that the two merger clauses and accompanying definitions should be read together as part of the same transaction in order to ascertain the parties' intent, *Fort Worth Independent School District v. Fort Worth*, 22 S.W.3d 831, 840 (Tex. 2000), the most natural reading is that the Application is not part of the Loan Documents. Not only is the Application an application for a loan rather than a final loan agreement, the language on which DT Apartment relies is more akin to an effort at marketing than to a final agreement:

> As a securitization B-piece buyer and a CMBS servicer, CWCapital retains the risk piece and the servicing on almost every loan it makes. After you close—and throughout the life of the loan—you will get the professional attention you need from a servicing group that controls servicing decisions. Experienced staff members provide unmatched accountability and responsiveness.

P. Resp. CWCapital 12-13 n.8. Moreover, DT Apartment describes an "exit fee" allegedly contained in the Application, which matches to an "exit fee" embodied in the Note. This indicates that, where the parties intended to preserve an agreement contained in the Application, they embodied that agreement in the loan documents. Finally, the court notes that the fourth amended complaint omits the Application when listing the documents that are considered "Loan Documents." 4th Am. Compl. ¶¶ 30-31. In fact, DT Apartment recognizes that at least some of the provisions in the Application were superseded, asserting that the

- 14 -

provision on which it relies is a "portion of the agreement [that] survived later loan documents." *Id.* at ¶ 185. But DT Apartment provides no reason why part of the Application, much less the "unmatched" language, survives.

The court therefore concludes that the Application, and any promises it contains, were superseded.

3

DT Apartment has also failed to state a plausible claim based on the allegation that defendants denied detailed funding requests. DT Apartment alleges that the CMA provided that a borrower "shall" receive funds for "usual and customary actual expenses of operating and maintaining the Property." 4th Am Compl. ¶ 110. Defendants argue that this claim should be dismissed because it requires defendants to reimburse DT Apartment, not to pay the expenses in the first instance.

The court agrees that the CMA requires only reimbursement. The provision at issue[6] states:

> Borrower shall be entitled to receive *reimbursement* from the Operating Expense Sub-Account for the payment of Budgeted Operating Expenses, Approved Additional Operating Expenses, and Qualified Emergency Expenses. "Operating Expenses" shall mean the usual and customary actual expenses of operating and maintaining the Property . . . . "Budgeted Operating Expense" shall mean an expense incurred in operating the Property which is provided for in an Approved Operating Budget . . . .

---

[6]The fourth amended complaint does not cite the CMA provision to which it refers, but given the selective quoting and defendants' response briefs, the court understands that DT Apartment is referring to this provision.

"Approved Additional Operating Expense" shall mean any expense of operating the Property other than a Budgeted Operating Expense, if . . . approved . . . in advance of its being incurred.  "Qualified Emergency Expenses" shall mean [*inter alia*, a reasonable expense that results from an unforeseen emergency].

CWCapital App. 126-27 (emphasis added).  It then states:

Lender shall distribute funds monthly from the Operating Expense Sub-Account in accordance with the Approved Operating Budget.  Lender also shall distribute funds from the Operating Expense Sub-Account for Approved Additional Expenses and Qualified Emergency Expenses . . . .  In addition, Lender may distribute funds for such other Operating Expenses as Lender may approve in its sole discretion.

*Id.* at 127.

It is unambiguous that defendants were responsible only for reimbursing expenses that were previously approved or were incurred in an emergency.  The first quoted paragraph of the provision sets forth the types of expenses for which DT Apartment is entitled to reimbursement: namely, Budgeted Operating Expenses, Approved Additional Operating Expenses, and Qualified Emergency Expenses.  The second quoted paragraph addresses how often ("monthly") the expenses must be paid and from which account ("the Operating Expense Sub-Account") the funds are to be paid.  The "shall" language provides only that the specified expenses must be reimbursed; it does not alter the language requiring that the payment of funds be for reimbursement rather than payment in the first instance.  This is further made clear by the last sentence of the second paragraph, which addresses funds not within the three categories of expenses for which DT Apartment is entitled to reimbursement:

- 16 -

other Operating Expenses.  Distribution of funds for these expenses is in the defendants' "sole discretion."

Despite these requirements, the fourth amended complaint does not allege that defendants denied reimbursement for any expenses for which DT Apartment is entitled to reimbursement.  Rather, the complaint conclusorily asserts that defendants denied funding requests for "usual and customary actual expenses of operating and maintaining the Property," and that these were "proper and detailed funding requests."  4th Am. Compl. ¶¶ 110, 188.  Without an allegation that DT Apartment sought *reimbursement* for funds included in one of the defined categories of operating funds listed in the CMA, DT Apartment has not stated a plausible claim on which relief can be granted.

V

The court now considers DT Apartment's fraud claims.

A

The elements of common law fraud in Texas are

> (1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result.

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004) (Texas law) (citations omitted).  To prove fraud based on a promise of future performance, a plaintiff must show that the party making the promise had no intention of performing at the time it made the promise.

- 17 -

B

The fourth amended complaint appears to allege two fraud claims.  DT Apartment alleges, first, that defendants created a scheme or artifice to defraud it of its ownership and investment in the Properties.  This alleged scheme is supported by myriad factual allegations, including defendants' false promise of a two-phase lending relationship, triggering the lock box, depriving DT Apartment of funds, filing improper notices of foreclosure, interfering with sale opportunities, seeking a receivership, and refusing to provide a loan pay off amount.  Defendants move to dismiss this claim on the grounds that DT Apartment released any claim that existed at the time of the release, cannot allege detrimental reliance on oral statements, and has not pleaded fraud with particularity.  The second claim is that defendants fraudulently sought the name of a potential buyer and then used that information to thwart the sale.[7]  Defendants respond that, although the court did not dismiss this claim in *DT Apartment I*, it should dismiss the claim now because the facts alleged in the fourth amended complaint do not establish damages.[8]

---

[7]Although the facts underlying this claim are also incorporated into the first claim, the court treats the claim as separate.

[8]DT Apartment's response brief to US Bank's motion to dismiss argues that the Application helps support a fraud claim.  Not only is this not in the fourth amended complaint, but, for the reasons stated *supra* in § IV, this document is superseded and therefore DT Apartment cannot rely on it.

C

DT Apartment cannot plead around its release by asserting a broad scheme or artifice to defraud that extends to a time after the release. It released any claims related to the loan documents that existed as of March 9, 2009, whether the claims were "known or unknown, suspected or unsuspected" at the time. CWCapital App. 162. Therefore, DT Apartment has failed to plead a plausible fraud claim based on promises of a two-phase lending relationship, triggering of the lock box, or deprivation of funds prior to March 9, 2009.

This leaves for consideration whether the remaining factual allegations support a fraud claim. Neither the notices of foreclosure, seeking a receivership, nor failing to include a loan pay off amount constitute a basis for a plausible fraud claim, as alleged. Fraud based on these facts is not briefed, but DT Apartment appears to allege in its fourth amended complaint that these actions constitute fraud because they are part of the scheme or artifice by which defendants sought to deprive it of its investment in the Properties, and that any lack of affirmative misrepresentations is not dispositive because "fraud is deducible from artifice and concealment as well as from affirmative conduct of a character to deceive." 4th Am. Compl. ¶ 191 (citing *Corpus Christi Teachers Credit Union v. Hernandez*, 814 S.W.2d 195, 197 (Tex. App. 1991, no writ)). But even though the court may consider the complete transaction to determine whether fraud occurred through concealment, DT Apartment's claim lacks sufficient detail to plead fraud as Rule 9(b) requires. This is not to say the fourth amended complaint is lacking in length—it is 86 pages. But it lacks the necessary factual detail. As the Fifth Circuit has written in a similar context, "[a] complaint can be

long-winded, even prolix, without pleading with particularity . . . . [S]uch a garrulous style is not an uncommon mask for an absence of detail." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). As *DT Apartment I* concluded, DT Apartment does not allege in other than conclusory terms that the foreclosure was noticed by improper parties; it also does not allege why a receivership or a failure to provide a pay-off amount is deceptive. Alleging a scheme to deprive DT Apartment of the Properties does not convert every action harmful to DT Apartment's interest into a fraudulent act, and under Rule 9(b)'s stringent pleading requirements, DT Apartment has failed to allege why these acts were fraudulent.

Nevertheless, in *DT Apartment I* this court held that DT Apartment had stated a fraud claim by alleging that CW Asset misrepresented its intentions in order to obtain the name of a prospective buyer of the Properties. *DT Apartment I*, 2012 WL 6693192, at *7. Defendants argue that, in the fourth amended complaint, DT Apartment alleges that its injury was caused by defendants' posting the property for sale, not as the result of defendants' misrepresentation, and therefore has failed to state a claim for relief. *See Fluorine On Call*, 380 F.3d at 858 (holding that injury as result of misrepresentation is element of fraud claim). The court disagrees. The fourth amended complaint alleges that DT Apartment was injured because defendants misleadingly obtained the name of a prospective buyer, told the buyer of the intent to foreclose, and encouraged the buyer to purchase the Note. *See* 4th Am. Compl. ¶¶ 133-35. Although these allegations are set out in the facts section of the fourth amended complaint rather than under the rubric of the fraud claim, they are nonetheless alleged and incorporated. Therefore, for the reasons articulated in *DT Apartment I*, 2012 WL

6693192, at *7, the court declines to dismiss this basis for the fraud claim

In sum, the court dismisses DT Apartment's overarching fraud claim but does not dismiss its claim for fraud predicated on defendants' alleged acts that misled DT Apartment into disclosing the name of a potential buyer.

## VI

DT Apartment also alleges a claim for fraudulent inducement.

## A

To state a claim under Texas law for fraudulent inducement, a plaintiff must allege all of the elements of fraud as well as "an underlying contract which was induced." *Kevin M. Ehringer Enters., Inc. v. McData Servs. Corp.*, 646 F.3d 321, 325 (5th Cir. 2011) (citing *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2011)).

## B

DT Apartment alleges that it

> signed both the original loan documents based upon a belief induced by [CW Capital] and the later Forbearance Agreement and [Modification Agreement] based upon a belief induced by [CW Asset] . . . that the original loan and any modification and extension would be short term only, and that [CW Capital] would arrange a long term [loan].

4th Am. Compl. ¶ 195.  It also asserts that defendants withheld information about their true incentives in order to induce DT Apartment to enter into the loan and the modification. *Id.* at ¶ 196.  Defendants maintain that the fraudulent inducement claims are released and that DT Apartment could not reasonably rely on a promise of a two-phase loan.  CWCapital also

contends that DT Apartment disclaimed reliance on any statements by defendants, and that fraud has not been pleaded with particularity.

## C

The court holds that the fraudulent inducement claim based on representations made prior to signing the original loan documents has been released. Despite DT Apartment's allegation that the releases it signed did not expressly reference or release fraudulent inducement claims, and that the parties did not discuss or understand that such claims would be released, the release clause from the Modification Agreement is unambiguous. This clause releases defendants from "any and all causes of action, suits . . . , [and] claims . . . of any kind or nature whatsoever, known or unknown, suspected or unsuspected" that DT Apartment then had against defendants "arising from, based upon, or related to, whether directly or indirectly," the loan documents, any other related agreement, or any defense as to the enforcement of the loan documents. CWCapital App. 162-63; *see Haase*, 62 S.W.3d at 798-99. Because DT Apartment's claim requires a contract, and here the claim is predicated on the Note and Deed of Trust, the claim unambiguously relates to the loan documents. And because a claim for fraud, and causes of action generally, accrue on the date that the defendant makes the allegedly false representation, DT Apartment's fraudulent inducement claim regarding the Note and Deed of Trust existed at the time of the release. *See Woods v. William M. Mercer, Inc.*, 769 S.W.2d 515, 517 (Tex. 1988); *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998). DT Apartment's claim that it was fraudulently induced to sign the original loan documents is therefore released.

- 22 -

The alleged misrepresentations regarding future phases of the loan that occurred prior to signing the Modification Agreement and Forbearance Agreement do not state a claim for relief because DT Apartment disclaimed reliance on any such representations. The Supreme Court of Texas has held that a "release that clearly expresses the parties' intent to waive fraudulent inducement claims, or one that disclaims reliance on representations about specific matters in dispute, can preclude a claim of fraudulent inducement." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997). But "[p]ure merger clauses, without an expressed clear and unequivocal intent to disclaim reliance or waive claims for fraudulent inducement, have never had the effect of precluding claims for fraudulent inducement." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 334 (Tex. 2011). In *Italian Cowboy* the court held that the plaintiffs could maintain a fraudulent inducement claim where the alleged release did not speak of reliance. *Id.* at 336. This was in contrast to *Schlumberger* and *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51 (Tex. 2008), where the plaintiffs disclaimed reliance through provisions expressly stating that they did not "rely" on any of the defendant's statements. In fact, in comparing the language of the alleged disclaimers in each of the three cases—*Schlumberger*, *Forest Oil*, and *Italian Cowboy*—the *Italian Cowboy* court italicized the word "relying" in the provisions from *Schlumberger* and *Forest Oil* and noted the absence of the term "relying" from the provision at issue in *Italian Cowboy*. *See Italian Cowboy*, 341 S.W.3d at 336. The language of the Modification Agreement and the Forbearance Agreement is very similar to the language in *Schlumberger* and *Forest Hill*. The Modification Agreement states that defendants did not make "any

statement or representation to [DT Apartment] regarding any fact *relied upon* in entering this Agreement" and that DT Apartment had not "*relied* upon any statement, representation or promise of any other party" or person representing defendants.  CW Capital App. 163 (emphasis added).  The Forbearance Agreement contains the same language.  CW Capital App. 154.  Thus these provisions explicitly disclaimed reliance on any statements regarding a second, long-term phase of the loan, thereby precluding a fraudulent inducement claim.

If DT Apartment maintains that defendants have not adequately moved to dismiss on a basis on which the court relies in dismissing the fraudulent inducement claim, it may file an opposition response within 21 days of the date this memorandum opinion and order is filed.  Although the court can dismiss the claim on a ground not raised, it must employ a procedure that is fair to DT Apartment, and this will ensure compliance with that requirement.[9]

## VII

The court now turns to DT Apartment's breach of fiduciary duty claim.  As the court concluded in *DT Apartment I*, DT Apartment's third amended complaint failed to state a claim for breach of fiduciary duty because it failed to plead a fiduciary relationship between DT Apartment and defendants.  *DT Apartment I*, 2012 WL 6693192, at *11-12.  In so holding, the court noted that it would infer a fiduciary relationship in "extraordinary

---

[9]A district court has the authority to consider the sufficiency of the complaint and dismiss an action *sua sponte*, as long as the procedure it employs is fair.  *See, e.g., Biggers v. BAC Home Loans Servicing, LP*, 767 F.Supp.2d 725, 733-34 n.7 (N.D. Tex. 2011) (Fitzwater, C.J.).

circumstances such as excessive control and influence by the lender on the borrower's business," *id.* at *11 (quoting *Esty v. Beal Bank, S.S.B.*, 298 S.W.3d 280, 304 (Tex. App. 2009, no pet.)), yet discerned no extraordinary circumstances presented by the third amended complaint. *Id.* The court instead held that "defendants were exercising limited power designed to ensure full repayment of the loan." *Id.* DT Apartment's fourth amended complaint provides more detail about the control that defendants allegedly exercised, but the additional facts do not plead a plausible claim that defendants exercised more control and influence than that asserted in the third amended complaint. Accordingly, the court dismisses the breach of fiduciary claim.

## VIII

DT Apartment has repleaded a claim of tortious interference with prospective business relations based on the allegations that defendants fraudulently obtained from DT Apartment the identity of a prospective buyer of the Properties, informed the prospective buyer about plans to foreclose on the Properties, and invited that buyer to bid on the Note. In *DT Apartment I* the court held that this set of facts was sufficient to plead a plausible claim for relief. *See DT Apartment I*, 2012 WL 6693192, at *13. Now, in light of slightly altered language contained in the fourth amended complaint, defendants contend that the court should dismiss this claim because the alleged damages were caused by defendants' right to notice foreclosure. In support, defendants cite *Allied Capital Corp. v. Cravens*, 67 S.W.3d 486, 492 (Tex. App. 2002, no pet.), for the proposition that damages flowing from advertising a public sale to the public cannot support a tortious interference claim, and *Robles*

*v. Consolidated Graphics, Inc.*, 965 S.W.2d 552, 561 (Tex. App. 1997, pet. denied), for the proposition that nothing in the law prohibits the truthful disclosure of information. The court declines to accept defendants' argument. This characterization omits the context in which the notification allegedly occurred. Unlike in *Allied Capital* or *Robles*, where the plaintiffs tried to establish the disclosure of information as the underlying tort, here the underlying tort is not the disclosure of foreclosure information but the allegedly fraudulent acquisition of the prospective buyer's identity. Noticing foreclosure is only part of the allegedly fraudulent scheme to deprive DT Apartment of a suitable buyer for the Properties. As in *DT Apartment I*, the court holds that DT Apartment's tortious interference claim states a plausible claim on which relief can be granted.

## IX

DT Apartment also repleads its TTLA claims. In its third amended complaint, DT Apartment alleged two TTLA claims, one premised on the imposition of the lock box and the other on the administration of the lock box. The court held in *DT Apartment I* that the former stated a claim but was released, while the latter failed to state a claim because there was no underling breach of contract constituting theft. *See DT Apartment I*, 2012 WL 6693192, at *17, 22-23. DT Apartment reurges its TTLA claim premised on the *imposition* of the lock box, arguing that the release is invalid. Because the court concludes the release is valid, *see supra* § III, the court dismisses this claim.

DT Apartment argues that its TTLA claim based on the *administration* of the lock box states a claim on which relief can be granted because DT Apartment has amended to state a

claim for breach of contract based on denial and delay of funding requests related to the lock box.  Because DT Apartment has not stated a claim on which relief can be granted premised on the denial of funding, *see supra* § IV, the court dismisses the derivative TTLA claim as well.

X

The court next addresses DT Apartment's repleaded civil conspiracy claim.  In *DT Apartment I* the court dismissed this claim on the ground that, although DT Apartment plausibly pleaded underlying torts, it failed to allege an object to be accomplished by the purported conspirators, and it alleged only conclusory statements with regard to other elements.  *DT Apartment I*, 2012 WL 6693192, at *20.  Defendants move on the same grounds to dismiss the claim asserted in the fourth amended complaint.

The court concludes that DT Apartment has pleaded a plausible claim for relief.  The underlying tort claims are the fraud claim relating to obtaining a prospective purchaser's identity and tortious interference with prospective business relations.  DT Apartment alleges the object of the alleged conspiracy: "to obtain effective control and ownership of the [Properties] through foreclosure or [DT Apartment's] abandonment." 4th Am. Compl. ¶ 217. The more difficult question is whether DT Apartment adequately alleges an agreement. Defendants argue that DT Apartment's only alleged factual support for an agreement is that each defendant's efforts to deprive it of the Properties were done in concert and within days of each other.  *See* 4th Am. Compl. ¶ 220.  Defendants then cite *Twombly* for the proposition that "without more, parallel conduct does not suggest conspiracy, and a conclusory allegation

- 27 -

of agreement at some unidentified point does not supply facts adequate to show illegality." *Twombly*, 550 U.S. at 556-557.  DT Apartment responds that it need only allege enough facts to plausibly suggest an agreement, and that it has done so.  The court agrees.

DT Apartment has sufficiently alleged that the parties interacted with one another via the loan agreements, as evidenced by the Forbearance Agreement's recitation that CW Mortgage was the noteholder, CW Asset was the special servicer, and CW Capital was the servicer.  DT Apartment also asserts that US Bank later was assigned CWCapital's interest in the Note, or, along with CW Mortgage and CW Capital, at least represented as much to a state court.  Moreover, unlike in *Twombly*, three of the defendants are part of the same corporate structure and therefore share certain high-level directors and corporate resources.  This relationship, combined with the alleged coordinated conduct, is sufficient to plead a plausible claim.  This is not a complaint that simply recites the elements of conspiracy, *see, e.g., Berry v. Bryan Cave LLP*, 2010 WL 1904885, at *6 (N.D. Tex. May 11, 2010) (Boyle, J.), or makes factual allegations that "merely are consistent with the defendants' liability," *Glotfelty v. Karas*, ___ Fed. Appx. ___, 2013 WL 600253, at *5 (5th Cir. Feb. 15, 2013) (per curiam), but instead asserts facts that, in combination with concerted action, rise to the level of plausibility.  *Twombly* held in the context of an antitrust action that "without some further factual enhancement [an allegation of parallel conduct between companies] stops short of the line between possibility and plausibility."  *Twombly*, 550 U.S. at 557.  The relationship between the defendants here pushes their alleged coordinated action from being merely consistent with liability to plausibly asserting an agreement.

XI

The court finally addresses agency. Because agency is not a cause of action, *see Crooks v. Moses*, 138 S.W.3d 629, 637 (Tex. App. 2004, no pet.), the court dismisses this claim.

DT Apartment also argues that CW Asset was acting as the agent for CWCapital, CW Mortgage, and US Bank, which would make each defendant potentially liable for CW Asset's alleged fraud and tortious interference related to obtaining the prospective buyer's identity. CWCapital argues that DT Apartment has not pleaded facts to support a plausible claim that CW Asset was its agent, and therefore the court should dismiss the fraudulent inducement and tortious interference claims as to it. In response, DT Apartment points to the Forbearance Agreement and Modification Agreement, which it argues make clear that CW Asset was acting as a special loan servicer under the direction of CWCapital. DT Apartment also posits, without citation to any applicable paragraph in the complaint, that it has set out in detail how CW Asset's authority was derived from a specific grant of authority from CWCapital.

The court concludes that DT Apartment has not plausibly alleged that CW Asset acted as CWCapital's agent. Because only DT Apartment's fraudulent inducement and derivative tortious interference claims remain, agency is an element of such claims against CWCapital, and therefore must be pleaded with the particularity required under Rule 9(b). *See In re Enron Corp. Sec., Derivative, & "ERISA" Litigation*, 540 F.Supp.2d 759, 782 (S.D. Tex. 2007) ("When agency is an element of a fraud claim, agency must be pleaded with

particularity required under Rule 9(b).") (citation omitted).  To meet this standard, DT Apartment relies on the Forbearance and Modification Agreement, which it argues specifically states that CW Asset is a special servicer for CW Capital.  Yet the Forbearance Agreement states that CW Mortgage is the noteholder and that CW Asset "is the special servicer, [and [CW Capital] is the servicer, for Noteholder for the Loan.]"  CWCapital App. 150 (outer brackets in original).  Similarly, the Modification Agreement states that CW Mortgage is the noteholder, CW Asset is the special servicer, and CW Capital is the servicer. Thus, assuming *arguendo* that this alleges a plausible agency relationship between CW Asset and CW Mortgage, it does not plausibly allege that CW Asset was CW Capital's agent.

In addition to dismissing the agency claim, therefore, the court also dismisses the fraudulent inducement and tortious interference claims against CW Capital because it cannot be held accountable for CW Asset's conduct.[10]

---

[10]The court does not dismiss the same claims as to CW Mortgage or US Bank as principals of CW Asset because neither party moves for dismissal on this ground.  Rather, these defendants ask only for the agency claim to be dismissed because agency is not a cause of action.

- 30 -

*     *     *

For the reasons explained, CWCapital's motion to dismiss is granted in part and denied in part.

**SO ORDERED.**

May 28, 2013.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE